CITY OF ROCKWALL,
Texas, Petitioner,

v.

Vester T. HUGHES, as Sole Indepen-
dent Executor of the Estate of W.W.
Caruth, Deceased, Respondent.

No. 05–0126.

Supreme Court of Texas.

Argued Jan. 25, 2006.

Decided Jan. 25, 2008.

Rehearing Denied April 4, 2008.

Terry D. Morgan, Terry Morgan & Associates, P.C., James W. Morris Jr., Goins

Underkofler Crawford & Langdon, L.L.P., Dallas, F. Dayton Eckert Jr., Law Offices of F. Dayton Eckart Jr., Garland, Bob E. Shannon, Joseph R. Knight, Alice G. McAfee, Baker Botts LLP, Austin, TX, for Petitioner.

R. Matthew Molash, James A. Baker, Robert H. Mow Jr., Dwight A. Shupe, Matthew R. Miller, Garon R. Horton, Hughes & Luce, L.L.P., Dallas, TX, for Respondent.

Theodore Paul Gorski Jr., City of Fort Worth, Fort Worth, Edwin M. Snyder, City Attorney's Office, Denton, M. Scott Norman Jr., Texas Association of Builders, Scott Houston, Texas Municipal League, Austin, Darrin M. Coker, City Attorney for City of Pearland, Pearland, Brian D. Shannon, Texas Tech University School of Law, Lubbock, L. Stanton Lowry, Boyle & Lowry, LLP, Irving, TX, for Amicus Curiae.

Justice JOHNSON delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice WAINWRIGHT, Justice MEDINA, and Justice GREEN joined.

 A municipality generally must annex land pursuant to a plan giving three years' notice of its intent to annex. If an area is exempt from the three-year notice requirement, then annexation can take place by use of abbreviated procedures with less notice of a city's intent to annex.

In this case, a landowner sought inclusion in the City of Rockwall's three-year annexation plan. The City denied the request, claimed the proposed annexation was statutorily exempt from the three-year requirement, and gave notice of intent to annex the landowner's territory under abbreviated procedures. The landowner requested that the City arbitrate the dispute. When the City refused, the landowner sought a court order compelling arbitration. The trial court refused to compel arbitration and dismissed the landowner's case for lack of jurisdiction. The court of appeals held that the City must arbitrate. We reverse the judgment of the court of appeals and affirm the trial court's judgment dismissing the suit.

## I. Background

### A. Annexation Law

The Texas Constitution confers on cities the power to annex land. TEX. CONST. art. XI, § 5. The Legislature prescribes procedures to be used by cities in conducting annexations. See TEX. LOC. GOV'T CODE ch. 43;[1] Alexander Oil Co. v. City of Seguin, 825 S.W.2d 434, 439 (Tex.1991). Statutory annexation procedures require municipalities to prepare annexation plans specifically identifying areas which may be annexed beginning on the third anniversary of the date the plan is adopted or amended (a "three-year plan"). See TEX. LOC. GOV'T CODE § 43.052(c). Subchapter 43C sets out annexation procedures for areas included in such three-year plans. See id. §§ 43.051–.057.

Section 43.052(h) lists several types of exemptions from three-year plans. One type of area exempted is a "sparsely-populated" area. Id. § 43.052(h)(l). If an area is exempt from inclusion in a three-year plan, annexation occurs according to procedures set out in subchapter 43C–1. See id. § 43.061 ("This subchapter applies to an area proposed for annexation that is not required to be included in a municipal annexation plan under Section 43.052.").

---

1. Further references to Local Government Code provisions will generally be by reference to the chapter, section, or subsection number.

Annexations of section 43.052(h)(*l*) sparsely-populated areas may be initiated subject to 30 days' notice of the first hearing on the proposed annexation. *Id.* § 43.062(b). Annexations under subchapter 43C–1 procedures generally must be completed within ninety days of the time proceedings are begun. *Id.* § 43.064. Cities are prohibited from using the section 43.052(h)(1) "sparsely populated" exemption to circumvent requirements that annexations be pursuant to a three-year plan. *Id.* § 43.052(i).

The controversy before us primarily involves subsections 43.052(c), (h), and (i) which in pertinent part provide as follows:

> (c) A municipality shall prepare an annexation plan that specifically identifies annexations that may occur beginning on the third anniversary of the date the annexation plan is adopted. The municipality may amend the plan to specifically identify annexations that may occur beginning on the third anniversary of the date the plan is amended.
>
> . . . .
>
> (h) This section [43.052] does not apply to an area proposed for annexation if: (1) the area contains fewer than 100 separate tracts of land on which one or more residential dwellings are located on each tract. . . .
>
> (i) A municipality may not circumvent the requirements of this section by proposing to separately annex two or more areas described by Subsection (h)(1) if no reason exists under generally accepted municipal planning principles and practices for separately annexing the areas. If a municipality proposes to separately annex areas in violation of this section, a person residing or owning land in the area may petition the municipality to include the area in the munici-

pality's annexation plan. If the municipality fails to take action on the petition, the petitioner may request arbitration of the dispute. The petitioner must request the appointment of an arbitrator in writing to the municipality. Sections 43.0564(b), (c), and (e) apply to the appointment of an arbitrator and the conduct of an arbitration proceeding under this subsection.

## B. The Controversy

The estate of W.W. Caruth (the Estate) owns 405 acres of land (the Caruth property) within a part of the extraterritorial jurisdiction of the City, a home-rule city. In August 2004, the Estate applied to the City for initial approval of a residential development plan for the Caruth property. After the Estate filed its application, the City initiated annexation procedures pursuant to section 43.052(h)(*l*) in regard to two areas: one included the Caruth property and another included land not contiguous to the Caruth property. The City sent notices of annexation to affected persons[2] pursuant to subchapter 43C–1 procedures for areas exempted from three-year annexation plans. The Estate objected to the City's attempt to annex using subchapter 43C–1 procedures and petitioned the City to include the Caruth property in the City's three-year annexation plan. The Rockwall City Council adopted a resolution rejecting the Estate's request. The Estate then asserted that the City was circumventing section 43.052(c)'s requirement that annexations be carried out pursuant to a three-year plan and requested arbitration pursuant to section 43.052(i). The City responded by advising the Estate that the proposed annexations were exempt from inclusion in a three-year plan

---

**2.** Section 43.052(i) refers to "persons residing or owning land in the area." We will refer to such persons as "landowners" for ease of reference.

and the Estate's "request for arbitration [was] not appropriate."

The Estate filed suit in district court seeking an order compelling arbitration pursuant to section 43.052(i) and a temporary restraining order and temporary injunction preventing the City from proceeding with annexation pending completion of arbitration, including related appeals, if any. The City responded, in part, by filing a plea to the jurisdiction asserting that the Estate did not have standing because the dispute concerned annexation procedures, the suit was a collateral attack on the annexation ordinances and proceedings and the only way to challenge alleged annexation procedural irregularities was through quo warranto proceedings. In support of its plea to the jurisdiction, the City argued, in part, that section 43.052(i) authorized the Estate to request arbitration if the City did not take action on the Estate's petition to be included in a three-year plan but that the City took action on the petition by denying it. The trial court denied the Estate's applications, granted the City's plea to the jurisdiction and dismissed the action.

The Estate appealed. The court of appeals agreed with the Estate's interpretation of section 43.052(i):

> [W]e read the plain language of the statute to provide that, if the City fails to take action on the petition *to include the area in the [three-year] annexation plan,* the landowner may request arbitration of the dispute.

153 S.W.3d 709, 713–14 (emphasis added). The court of appeals reversed and remanded with instructions that the trial court compel arbitration and enjoin the City from proceeding with annexation pending the outcome of arbitration. *Id.* at 714.

In this Court, the City, supported by amicus curiae,[3] maintains that the court of appeals erred in concluding that section 43.052(i) grants a private right to the Estate to elect, and thereby require, arbitration of the Estate's claim even though the City took action on the Estate's petition by denying it.[4] The Estate, also supported by amicus curiae,[5] claims it has standing because section 43.052(i) grants it a substantive, private right to require the City to arbitrate the Estate's claim.

## II. Standard of Review

Statutory construction is a legal question we review de novo. In construing statutes, we ascertain and give effect to the Legislature's intent as expressed by the language of the statute. *See State, Texas Parks and Wildlife Dept. v. Shumake,* 199 S.W.3d 279, 284 (Tex.2006). We use definitions prescribed by the Legislature and any technical or particular meaning the words have acquired. TEX. GOV'T CODE § 311.011(b). Otherwise, we construe the statute's words according to their plain and common meaning, *Texas Department of Transportation v. City of Sunset Valley,* 146 S.W.3d 637, 642 (Tex.2004), unless a contrary intention is apparent

3. This Court has received briefs in support of the City's position from the Texas Municipal League and the Texas cities of Fate, Fort Worth, Denton, and Pearland.

4. The City also maintains that even if section 43.052(i) grants a right to arbitration, the Estate still lacks standing because section 43.052(i) comprises a procedural part of the annexation process and violations of procedural requirements can only be challenged

through quo warranto proceedings. We do not reach the argument and express no opinion on it.

5. This Court has received briefs in support of the Estate from Brian Shannon, Associate Dean and Charles "Tex" Thornton Professor of Law at Texas Tech University and by the Texas Association of Builders.

from the context, *Taylor v. Firemen's and Policemen's Civil Service Commission of City of Lubbock,* 616 S.W.2d 187, 189 (Tex. 1981), or unless such a construction leads to absurd results. *Univ. of Tex. S.W. Med. Ctr. v. Loutzenhiser,* 140 S.W.3d 351, 356 (Tex.2004); *see also Tex. Dep't of Protective and Regulatory Servs. v. Mega Child Care, Inc.,* 145 S.W.3d 170, 177 (Tex. 2004) (noting that when statutory text is unambiguous, courts must adopt the interpretation supported by the statute's plain language unless that interpretation would lead to absurd results). We presume the Legislature intended a just and reasonable result by enacting the statute. TEX. GOV'T CODE § 311.021(3).[6] When a statute's language is clear and unambiguous, it is inappropriate to resort to rules of construction or extrinsic aids to construe the language. *See St. Luke's Episcopal Hosp. v. Agbor,* 952 S.W.2d 503, 505 (Tex.1997); *Ex parte Roloff,* 510 S.W.2d 913, 915 (Tex.1974).

### III. Analysis

■ The statutory language on which the issue turns provides: "If the municipality fails to take action on the petition, the petitioner may request arbitration of the dispute . . . ." TEX. LOC. GOV'T CODE § 43.052(i). The Estate urges that the statute be read differently than the plain language reads. The Estate says that the statute "expressly provides for arbitration between a landowner and a city when the city, upon the petition of a landowner, fails to act *to include the landowner's property in a three year annexation plan.*" (Emphasis added). The Estate asks that we

affirm the court of appeals' construction to that effect. We decline to do so.

We first address the City's standing argument. In challenging the Estate's standing, the City cites *Alexander Oil Co. v. City of Seguin,* 825 S.W.2d 434 (Tex. 1991), for the proposition that the Estate does not have standing because the validity of the City's annexation can only be challenged by a quo warranto proceeding unless the proposed annexation is wholly void. *See id.* at 436 ("The only proper method for attacking the validity of a city's annexation of territory is by quo warranto proceeding, unless the annexation is wholly void."). The City reasons that the trial court lacked jurisdiction to hear a suit to compel arbitration because the Estate does not allege that the City has no power to annex the areas in question or that the annexation proceedings are otherwise wholly void, but rather alleges only that the City must annex pursuant to the three-year plan procedures of subchapter 43C as opposed to using the more expedited procedures of subchapter 43C–1.

■ In *Alexander Oil,* the City of Seguin passed an ordinance annexing land owned by Alexander Oil Company. *Id.* at 435. Alexander Oil filed suit alleging that Seguin failed to comply with procedures required by the Municipal Annexation Act[7] such as providing proper notice for hearings, conducting the required hearings, and providing an annexation plan. *Id.* at 436. Seguin responded that because the ordinance annexing Alexander Oil's

---

**6.** We may also consider legislative history in construing a statute that is not ambiguous. *See* TEX. GOV'T CODE § 311.023(3). In this instance we are at a disadvantage because the language in question was crafted by a conference committee, and legislative history does not provide illumination as to how it was formulated.

**7.** TEX.REV.CIV. STAT. art 970a §§ 6, 10, *repealed by* Act of May 1, 1987, 70th Leg., R.S., ch. 149, § 49, 1987 Tex. Gen. Laws 1306, *now codified as* TEX. LOC. GOV'T CODE §§ 43.052, .053, .056. Further references are to the Local Government Code.

property was not void, a quo warranto[8] proceeding by the State was the only proper way to collaterally attack the ordinance and the case should be dismissed. *Id.* The Court agreed with Seguin that procedural irregularities render ordinances voidable, not void. *Id.* at 439. The Court also noted that the Legislature had not expressly provided a private action to set aside annexations where an annexation ordinance is merely voidable. *Id.* at 437. Thus, *Alexander Oil* affirmed the rule that unless an annexation is wholly void or the Legislature has expressly granted a private right to challenge the annexation in some manner, a quo warranto proceeding brought by the State is the only proper means of attacking a municipality's annexation in court. *Id.*

The Estate does not urge that the City's annexation proceeding is void or that the City lacks power to annex the area in question. Nor does the Estate challenge the authorities. The City cites various cases for its contention that the annexation process in general is procedural. *See Werthmann v. City of Fort Worth,* 121 S.W.3d 803 (Tex.App.-Fort Worth 2003, no pet.); *City of Balch Springs v. Lucas,* 101 S.W.3d 116 (Tex.App.-Dallas 2002, no pet.); *City of San Antonio v. Hardee,* 70 S.W.3d 207 (Tex.App.-San Antonio 2001, no pet.). The Estate says those authorities simply are not applicable because none of them interpret the language of section 43.052(i) which is the issue in this case. The Estate maintains that it has standing because subsequent to *Alexander Oil* the Legislature expressly granted landowners a substantive private right to arbitration by enacting section 43.052(i). It argues that when the Legislature enacted comprehensive changes in 1999 to impose order in annexation law, the cornerstone of the changes was section 43.052(c)'s requirement that municipalities must prepare annexation plans specifically identifying areas that may be annexed beginning on the third anniversary of the date the plan is adopted or amended. According to the Estate, the exemptions of section 43.052(h) have been used regularly by cities to circumvent the three-year planning requirement. The Estate posits that by enacting section 43.052(i), the Legislature must have intended to protect against such abuse by requiring arbitration if a municipality fails to take action on a landowner's petition to incorporate the land into the city's three-year plan and that any other interpretation of the statute would lead to absurd results. As part of its argument, the Estate references the policy of the State which favors arbitration of disputes and the short time frame necessary to complete arbitration if there are no appeals from the arbitration award. *See Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 268 (Tex.1992). The Estate also argues that it would be illogical for the Legislature to have crafted a detailed statutory framework around the requirement that municipalities enact three-year annexation plans, provide for exemptions to the three-year plan requirement, allow landowners to contest whether a city is circumventing the three-year plan requirement by requesting inclusion in a three-year plan, yet require a city to arbitrate the contest only if the city ignores, or "pocket vetoes," the petition.

■ But we are not persuaded that the process and result called for by the plain language of the statute is illogical, much

8. Quo warranto proceedings are used by the State to protect itself and the good of the public through agents of the State who control the proceedings. *See Fuller Springs v. State ex rel. City of Lufkin,* 513 S.W.2d 17, 19 (Tex.1974); *State ex rel. Candler v. Court of Civil Appeals, Fourth Supreme Judicial Dist.,* 123 Tex. 549, 75 S.W.2d 253 (1934); *Staples v. State,* 112 Tex. 61, 245 S.W. 639 (1922).

less absurd. Subchapters 43C and 43C–1 contain extensive provisions in regard to annexations. Section 43.052(i) is detailed in specifying how and when the landowner may present a complaint to the city. It incorporates by reference part, but not all, of section 43.0564's arbitration procedures. And in the midst of the detailed language, we find that the Legislature specifically addressed when arbitration may be requested: "If the municipality fails to take action on the petition...." In regard to "logic," it seems to us that by crafting language specifying when arbitration of the dispute could be requested, legislators logically would have considered that there are two instances in which a dispute would need to be resolved. The first instance is if the city did not bring the landowner's petition up for consideration, or, if it was brought up for consideration, the city failed to take action on it one way or the other (what the parties refer to in this case as a "pocket veto"). The second instance is if the city denied the petition and refused to put the land into a three-year plan. It follows, logically, that because the statutory language as enacted allows arbitration to be requested only in the first instance, the Legislature's intent was not to provide for arbitration in the second instance. *See Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex.1981) ("It is a rule of statutory construction that every word of a statute must be presumed to have been used for a purpose ... [and] we believe every word excluded from a statute must also be presumed to have been excluded for a purpose.").

■ Contrary to the Estate's position, we see benefits from reading the statute's language literally. One significant benefit is that by not reading language into the statute when the legislature did not put it there, we do not risk crossing the line between judicial and legislative powers of government as prescribed by article II of the Texas Constitution. TEX. CONST. art. II, § 1. ("[N]o person, or collection of persons, being of one of these [three governmental] departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted."). Another benefit is that by interpreting statutes such as this in a straightforward manner, we build upon the principle that "ordinary citizens [should be] able 'to rely on the plain language of a statute to mean what it says.'" *Fitzgerald v. Advanced Spine Fixation Sys.*, 996 S.W.2d 864, 866 (Tex.1999) (quoting *Addison v. Holly Hill Fruit Prods. Inc.*, 322 U.S. 607, 618, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944)).

As presented in this case, construing the statute's language to mean what it says results in a landowner having the right to request arbitration only if a city refuses to include the area in question in a three-year plan, fails to deny the petition, and fails to otherwise accommodate the landowner. The statute as written, in effect, provides a structured method for landowners to seek redress from cities if landowners believe cities are annexing in violation of section 43.052(c). If a landowner petitions to be included in a three-year plan and the city acts on the petition in a way that is acceptable to the landowner, there is no dispute to be resolved. If the city denies the landowner's petition, then the landowner has notified the city of its specific complaint in writing and pursued and exhausted a legislatively-provided method for seeking redress before asking a State's attorney to disrupt the city's annexation process by filing a quo warranto action. *See* TEX. CIV. PRAC. & REM.CODE § 66.002(c) (quo warranto proceedings may be brought by the attorney general or county or district attorney on his or her own motion or at the request of an individual). And a city has the option of taking no

action to either grant or deny the landowner's petition and, thereby, effectively agreeing to arbitration of the dispute if the landowner requests arbitration. Under this last scenario, the arbitration essentially is a dispute resolution process agreed to by the parties. In the event multiple landowners submit petitions, the city might delay acting on the petitions in an attempt to have all the petitioning landowners agree to join in one arbitration to resolve the issue(s). If an agreement cannot be reached to join in one arbitration, the city might choose to either grant or deny each petition. The landowners whose petitions are denied have the option of seeking institution of a quo warranto action in which the claims of all landowners will be resolved, instead of the city and each landowner being involved in individual arbitration proceedings.

The literal language of the statute can be viewed as a legislative attempt to encourage cities and landowners to resolve their conflicts without court action. First, if the statute is interpreted according to its literal language—not mandating arbitration if a landowner's petition is denied—the result is that neither landowners nor cities have lost protections which they had prior to the statute's amendment. Landowners will continue to have the right to seek a quo warranto action to challenge the annexation. Cities will continue to be protected because a disinterested party such as the attorney general or a county or district attorney will review and weigh the strength of landowner claims before cities are subjected to litigation and disruption of their annexation processes. By giving landowners the right to request arbitration if cities delay taking action on their petitions, the Legislature gave landowners leverage to push the processes to conclusion, prevent pocket vetoes of petitions to be included in three-year plans and, if necessary, bolster arguments to state's attorneys in support of quo warranto actions to challenge proposed annexations.

■ But in any event, our standard for construing statutes is not to measure them for logic. *See Lee v. City of Houston,* 807 S.W.2d 290, 293 (Tex.1991) ("Our function is not to question the wisdom of the statute; rather, we must apply it as written."). As previously noted, our standard is to construe statutes to effectuate the intent of the Legislature, with the language of the statute as it was enacted to be our guide unless the context or an absurd result requires another construction. *See Fitzgerald,* 996 S.W.2d at 866 (Tex.1999) ("[I]t is a fair assumption that the Legislature tries to say what it means, and therefore the words it chooses should be the surest guide to legislative intent."); *Jones v. Del Andersen & Assocs.,* 539 S.W.2d 348, 350 (Tex.1976) ("[The intention of the Legislature] is to be found in the language of the statute itself ... we cannot give Section 28 the limited construction advocated by Andersen. To do so would require that we read into the statute words which are not there."). In this instance, the context does not indicate that the plain meaning of the language was not intended. The sentence in question addresses a separate subject from the surrounding language: the circumstances under which a city can be requested to arbitrate. It would not have been inconsistent with the context of the sentence for the Legislature to have provided that a landowner could request arbitration if the municipality failed to act favorably upon the landowner's petition or failed to include the landowner's property in a three-year annexation plan. Clearly, though, there is a difference between the meaning of the statute as it is written and the statute as contended for by the Estate.

The dissent agrees as to the standards for interpreting the statute and that "words matter" and "context matters." The dissent, however, says that "the most natural reading" of the statute results from adding words to make it mean something other than what the plain words mean. For the reasons we have set out, we disagree that the proper reading of the statute results from changing the language of the statute.

The dissent also references section 43.056(*l*), the provision for resolving disputes over whether a municipality has complied with the service plan adopted to provide full municipal services to the area to be annexed, and that section's use of the "[i]f the municipality fails to take action" language. A municipality's service plan must be adopted by the municipality's governing body and is a contractual obligation of the municipality by statute. *See* Tex. Loc. Gov't Code § 43.056(j), (k). Whatever construction is eventually given to the language of section 43.056(*l*)—and we venture none here because there is no controversy before us as to that section—it will be according to statutory construction principles. And that construction, when and if it occurs, must take into consideration the context of the language: section 43.056 addresses controversies regarding whether the municipality is fulfilling its service plan contractual commitment. The controversy presented by the present case and the statutory language of section 43.052(i) do not involve the question of whether a municipality is fulfilling a contractual obligation. The controversy involves a governmental decision of whether to annex territory, and if so, how.

In this regard, we note that sections 43.052(i) and 43.056(*l*) not only differ in the types of disputes they address, but also in how arbitrations of those disputes are to be conducted. Arbitration under section 43.056(*l*) must be in accordance with section 43.0565. Section 43.0565(d) specifies three options available to an arbitrator if the arbitrator finds that the municipality has not complied with its service plan requirements. But that same subsection provides that the municipality has the option of disannexing the area in lieu of complying with its service plan. In other words, even if an arbitration occurs pursuant to section 43.056(*l*), however it comes about, the municipality retains the right to make its own decision as to annexation or disannexation of the property. That prerogative is expressly not ceded to an arbitrator by the statute.

Section 43.052(i), on the other hand, provides only that sections 43.0564(b), (c), and (e) apply to the arbitration referenced in 43.052(i). Those sections address procedures for selecting an arbitrator, setting a hearing, giving notice of the hearing, and powers of the arbitrator in regard to conducting the arbitration. Section 43.052(i) does not prescribe or incorporate any provisions as to issues to be decided by the arbitrator, how long the arbitration is to take, when the arbitrator is to issue a decision, or whether the parties have a right to appeal the arbitrator's decision— all of which are provided by subsections of 43.0564 but not incorporated by 43.052(i). Nor does section 43.052(i) specify what remedies an arbitrator may impose, as does section 43.0565(d).

In sum, subchapter 43C provides different methodologies for arbitration in three different situations: (1) disputes under section 43.052(i), (2) disputes during negotiations for services to be provided by the municipality, *see* section 43.0564, and (3) disputes about whether the service plan has been fulfilled. Disputes arising under each different section and its dispute resolution provision must be construed in its own context. That is what we do as to the

controversy presented by this case: we construe the language of section 43.052(i) in its context.

■ The dissent also states that under our construction of the statute, if a city rejects the landowner's petition, the landowner has no further recourse. That is incorrect. The statute does not deprive the landowner of the right to a quo warranto action, which is the recourse long available to landowners.

■ If the Legislature desires to amend the statute to add words so that the statute will then say what is contended for by the Estate, we are confident it will do so. However, changing the meaning of the statute by adding words to it, we believe, is a legislative function, not a judicial function. *See* 67 TEX. JUR. 3d *Statutes* § 85 (2003) (noting that it is for the Legislature, not the courts, to remedy deficiencies, if any, in laws).

## V. Conclusion

We decline to read additional language into the statute as the Estate urges us to do. We go no further than the unambiguous language of the statute to interpret it. Section 43.052(i) does not create a substantive private right for a landowner to compel arbitration if a municipality takes action on the landowner's petition by denying it, as the City did. Accordingly, the Estate lacks standing to pursue the suit it filed.

We reverse the judgment of the court of appeals and render judgment dismissing the Estate's suit.

Justice WILLET filed a dissenting opinion, in which Justice HECHT, JUSTICE O'NEILL, and Justice BRISTER joined.

Justice WILLETT, joined by Justice HECHT, Justice O'NEILL, and Justice BRISTER, dissenting.

The Court espouses sound principles of statutory construction but unsoundly applies them. Basically, it takes literalism too literally. Read naturally, section 43.052(i) means this: landowners who request inclusion of their land in a city's annexation plan may arbitrate the city's failure to include it.

The City's position—arbitration is only available if the City *ignores* the petition, not if it *rejects* it—makes little sense. Studied in context, the arbitration-triggering phrase "fails to take action" in section 43.052(i) has a more substantively coherent meaning than "fails to take *any* action"; it necessarily means "fails to take *favorable* action." Landowners are seeking a specific outcome: inclusion in the city's annexation plan. The statute grants arbitration if the property remains excluded, and exclusion persists just as surely through *adverse* action as through *inaction*.

The meaning of "fails to take action" is best revealed by how this phrase is used in another Chapter 43 arbitration provision. Applying today's wooden construction to that provision dictates an illogical result that lays bare the Court's misinterpretation. As discussed more fully below, the Court's literalist interpretation would deny residents of areas annexed by the City of Houston their statutory right to arbitrate the City's failure to provide municipal services to the annexed area if the City rejects the residents' petition to enforce the service plan. As the Court reads "fails to take action," Houstonians deprived of basic city services will have no private remedy.

Read as a whole, the statutory scheme—in both section 43.052(i) and in section 43.056(*l*)—is straightforward and cannot bear the narrow meaning the Court ascribes to it. The Court's unduly restric-

tive reading is foreclosed by statutory context, and because context matters, I respectfully dissent.

## I. When Searching for Statutory Meaning, Words Matter— And So Does Context

The Court aptly describes, then misapplies, the pertinent ground rules for construing statutory language. Words and phrases must be read "in context and construed according to the rules of grammar and common usage."[1] The import of language, plain or not, must be drawn from the surrounding context, particularly when construing everyday words and phrases that are inordinately context-sensitive.[2] Given the power of context to transform the meaning of language, courts should resist rulings anchored in hyper-technical readings of isolated words or phrases,[3] or forced readings that are exaggerated or, at the other extreme, constrained.[4]

This "context matters" maxim—a cardinal rule not only of statutory construction but "of language itself"[5]—is rooted in common sense,[6] Texas statutory law,[7] and caselaw from both this Court[8] and the United States Supreme Court.[9]

1. TEX. GOV'T CODE § 311.011(a).

2. *Id.* Some familiar words, depending on how they are used, convey polar opposite meanings. For example, the word "sanction" may indicate approval ("I sanction eating that bowl of ice cream.") or disapproval ("My wife will sanction me for eating that bowl of ice cream."). *See* WEBSTER'S NEW WORLD DICTIONARY & THESAURUS 566 (Michael Agnes, ed., 2d ed.2002). Its meaning—permission or prohibition—turns entirely on context.

3. *Tex. Dep't of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 642 (Tex.2004) ("We must read the statute as a whole and not just isolated portions.").

4. *Cities of Austin, Dallas, Ft. Worth, & Hereford v. Sw. Bell Tel. Co.,* 92 S.W.3d 434, 442 (Tex.2002).

5. *Deal v. United States,* 508 U.S. 129, 132, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993).

6. As noted above, some words are auto-antonyms that can mean diametrically opposite things depending on the context. The word "fast," for example, can mean "swift" or "firmly fastened." *See* WEBSTER'S, *supra* note 2, at 233. The word "cleave" can mean "to adhere" or "to divide." *See id.* at 112. In my view, the Court's decision today "cleaves" to a myopic approach that "cleaves" literal meaning from plain meaning.

7. *See* TEX. GOV'T CODE § 311.011(a).

8. For example, in *Tooke v. City of Mexia,* 197 S.W.3d 325 (Tex.2006), our sole objective was to define the meaning of "sue and be sued"-type language. Rather than concluding that these simple and apparently unambiguous words have one, definitive meaning, we recognized that "the import of these phrases cannot be ascertained apart from the context in which they occur." *Id.* at 329; *see also, e.g., City of Sunset Valley,* 146 S.W.3d at 642.

9. In *Deal,* the Court identified numerous possible meanings of "conviction" in a bank robbery statute but reasoned that "of course susceptibility of all of these meanings does not render the word 'conviction,' whenever it is used, ambiguous; all but one of the meanings is ordinarily eliminated by context." 508 U.S. at 131–32, 113 S.Ct. 1993.

The author of *Deal,* Justice Scalia, was determined to drive home this point, as he wrote a dissent two weeks later in *Smith v. United States,* 508 U.S. 223, 241–47, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993), which centered on the meaning of "using a firearm" and where Justice Scalia again stressed the importance of giving words their fair meaning:

> To use an instrumentality ordinarily means to use it for its intended purpose. When someone asks, "Do you use a cane?," he is not inquiring whether you have your grandfather's silver-handled walking stick on display in the hall; he wants to know whether you *walk* with a cane. Similarly, to speak of "using a firearm" is to speak of using it for its distinctive purpose, *i.e.,* as a weapon.

*Id.* at 242, 113 S.Ct. 2050.

The Court is equally attuned to context in civil cases. In *Textron Lycoming Reciprocat-*

Accordingly, when interpreting the (h)(1) exemption for quick annexation of rural land and the arbitration remedy in subsection (i), we must consult the text and structure of surrounding and related provisions. Doing so yields a clear and forthright interpretation that confirms the statute's natural meaning while giving effect to every part of the statute.

Subsection (i) begins: "A municipality may not circumvent the [three-year plan] requirement[ ] by proposing to separately annex two or more areas described by Subsection (h)(1) if no reason exists under generally accepted municipal planning principles and practices for separately annexing the areas." This proscriptive language sets the context; lawmakers intended arbitration to curb the overzealous use of expedited, piecemeal annexations under subsection (h)(1) in order to evade the three-year planning requirement.

Ignoring this context, the Court adopts the City's view that "fails to take action" means "fails to take *any* action," in other words, when a city succumbs to bureaucratic inertia and does nothing. But if a city rejects a petition outright, the landowner has no further recourse.[10] This interpretation subverts the Legislature's effort to curb abusive annexation tactics.

The City complains that Hughes's interpretation requires arbitration of all requests, no matter how groundless, but the City's rigid interpretation enables it to deny all requests, no matter how meritorious. The Court's holding will effectively prescribe, not proscribe, the very circumvention that subsection (i), by its terms, was intended to cure.[11]

In context, the phrase "fails to take action" captures not only a city's inaction but also a city's overt denial of favorable action. The word "favorable" is implicit, honors the phrase's (and the overall statute's) common-sense meaning, and gives full effect to the statute's objective: giving landowners a specific and workable remedy against abuse of the (h)(1) exemption.

*ing Engine Division v. UAW of America*, 523 U.S. 653, 118 S.Ct. 1626, 140 L.Ed.2d 863 (1998) (construing "suits for violation of contracts"), the Union urged a narrow focus on the meaning of the preposition "for," but the Court refused to turn statutory interpretation into a brain teaser and instead insisted on a natural reading that examined each word in context, not under a microscope. *Id.* at 656–58 ("It is not the meaning of the word 'for' we are seeking here, but the meaning of '[s]uits for violation of contracts.'" (alteration in original)).

10. While this opinion uses the term "landowner" for simplicity, section 43.052(i) makes clear that a petitioner may be either "a person residing or owning land in the area." *Id.*

11. The record suggests that few cities enact three-year municipal annexation plans. In fact, amicus curiae The Texas Municipal League ("TML"), an association of more than 1,070 incorporated cities that advocates municipal interests, notes that many of its member "cities will have a one page plan stating that they do not intend to annex any area for

which an annexation plan is required." *See* Scott N. Houston, Tex. Mun. League, Municipal Annexation in Texas: "Is It Really That Complicated?" 13 (2003, updated Nov. 2004), *available at* htt p://www.tml.org/legal_pdf/ ANNEXATION111704.pdf. The City of Rockwall's annexation "plan" is a near carbon copy: "[t]he City does not intend to annex any territory that in order to be annexed, is required to be in an annexation plan." City of Rockwall, Tex., Ordinance 99–49 (Dec. 20, 1999). Hughes argues that such "plans" clash with a key objective underlying the Legislature's 1999 rewrite, that annexation decisions should be driven not by circumvention of the three-year planning process but by order, thoughtfulness, and predictability. Judging by the myriad amicus briefs filed by Texas cities, expedited annexations under (h)(1) are so common that (h)(1) is actually the rule. TML's brief admits as much, saying the (h)(1) exception "is routinely used by most home rule cities. Only a handful of cities annex under an annexation plan" at all.

In my view, the language cannot fairly be read any other way, and the Court's reading almost certainly undermines the Legislature's intent.

## II. The Court's Strained Reading Invites Absurd Results

The Court acknowledges that any interpretation, literal or not, that produces absurd results should be discarded.[12] In my view, the Court's interpretation works multiple absurdities.

## A. The Undeniable Meaning of "Fails to Take Action" Elsewhere in Chapter 43 Undercuts the Court's Literalist Construction of Subsection (i)

Most disconcerting is that the Court's noncontextual analysis cannot be squared with other parts of Chapter 43, principally section 43.056, which centers on the City of Houston's contractual duty to provide must-have services to areas slated for annexation (*e.g.*, fire and police protection, EMS, road maintenance, solid waste collection, water and wastewater facilities).[13] The Legislature in subsection (*l*) authorizes Houston residents and landowners to request arbitration to force compliance with the City's service plan, and, strikingly, it uses the very same "fails to take action" phrase that appears in section 43.052(i). Subsection (*l*) provides:

A person residing or owning land in an annexed area . . . may enforce a service plan by petitioning the municipality for a change in policy or procedures to ensure compliance with the service plan. If the municipality *fails to take action* with regard to the petition, the petitioner may request arbitration of the dispute. . . . [14]

Under long-settled authority, "fails to take action" must mean the same thing here as it does in section 43.052(i).[15] The multiple parallels at work here—the same phrase enacted the same day in the same bill describing the same proceeding—could not present a more "classic case for application of the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." [16]

I venture this prediction: if today's case centered not on subsection (i) but on sub-

---

12. *See* 246 S.W.3d. 627.

13. The statute defines the service plan as a contract between the city and the annexed area. TEX. LOC. GOV'T CODE § 43.056(k) ("On approval by the governing body, the service plan is a contractual obligation. . . ."). This contract establishes the method that the city will follow in extending services to the newly annexed area. TEX. LOC. GOV'T CODE § 43.056(b).

14. TEX. LOC. GOV'T CODE § 43.056(*l*) (emphasis added). Compare this statute with section 43.052(i): "If the municipality fails to take action on the petition, the petitioner may request arbitration of the dispute." It seems beyond serious dispute that "fails to take action *with regard to* the petition" in subsection (*l*) means exactly the same thing as "fails to take action *on* the petition" in subsection (i).

15. *See Comm'r of Internal Revenue v. Lundy*, 516 U.S. 235, 249–50, 116 S.Ct. 647, 133 L.Ed.2d 611 (1996), *superseded by statute*, Taxpayer Relief Act of 1997, Pub.L. No. 105–34, sec. 1282(a), 111 Stat. 1037 (codified as amended at 26 U.S.C. § 6512); *see also Dallas County Cmty. Coll. Dist. v. Bolton*, 185 S.W.3d 868, 873 (Tex.2005) ("We must interpret a statute according to its terms, giving meaning to the language consistent with other provisions in the statute."); *Paddock v. Siemoneit*, 147 Tex. 571, 218 S.W.2d 428, 435 (Tex. 1949) (observing that the same words must be given the same meaning unless context dictates otherwise).

16. *Lundy*, 516 U.S. at 250, 116 S.Ct. 647 (internal quotation marks omitted) (quoting *Sullivan v. Stroop*, 496 U.S. 478, 484, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990)); *see also Paddock*, 218 S.W.2d at 435.

section ($l$) and a Houston resident's request to arbitrate the City's alleged breach of a service plan, the Court would read "fails to take action" exactly as I read it in subsection (i). Studied consistently and contextually, the meaning is self-evident: someone in an annexed area can request arbitration to enforce the service plan if the city grants no relief on the petition.

Applying today's construction of "fails to take action," however, if the City of Houston denied a service-plan enforcement petition, arbitration would be unavailable. This reading runs head-long into subsection ($l$)'s two-step process for enforcing City of Houston service plans: (1) a petition urging the City to comply, then (2) arbitration if the petition produces no compliance. The notion that arbitration is possible only if the City refuses to move a bureaucratic muscle is conceptually untenable. The paramount goal of service-plan enforcement is illusory if the City of Houston can foreclose a service-plan challenge simply by rejecting the petition outright. Such a result would render subsection ($l$) wholly impotent and allow the concerns that prompted its enactment to thrive unchecked.[17] The landowner is seeking to compel obedience to the service plan—a formal "contractual obligation"[18]—and vital city services will remain unprovided whether the City rejects the petition or ignores it; granting arbitration only if the City's response is dilatory, but not if it is direct, works an absurd result.

The very next sentence in subsection ($l$) removes any doubt that the Legislature intended "fails to take action" to mean "fails to take favorable action." It authorizes persons living outside of Houston to apply for a writ of mandamus to prod service-plan compliance from their respective cities.[19] It cannot possibly be the law that every Texan outside the Houston city limits can freely and immediately seek mandamus relief to enforce their cities' service plans while Houstonians deprived of basic services and whose enforcement petitions are rejected must hope exclusively for a State-led quo warranto action. Again, this result defeats the fundamental purpose (and contractual promise) of the service-plan statute, but it is necessitated by the Court's construction of section 43.052(i).

Chapter 43 is most coherent and consistent when "fails to take action" means the same thing in both provisions. The Court, however, cites "context" to reserve the right to interpret subsection ($l$) differently because "sections 43.052(i) and 43.056($l$) not only differ in the types of disputes they address, but also in how arbitrations of those disputes are to be conducted."[20] That is true, but also irrelevant; the decisive "fails to take action" language is word-for-word identical and operates the same way—the triggering phrases are grammatical and structural twins—and there is no principled basis for distinguishing the indistinguishable.[21]

17. See HOUSTON, *supra* note 11, at 5–8 (describing the furor surrounding the City of Houston's annexation of suburban Kingwood in 1996, a controversy that fueled the Legislature's 1999 overhaul of Texas annexation law).

18. See *supra* note 13.

19. TEX. LOC. GOV'T CODE § 43.056($l$) ("A person residing or owning land in an annexed area

... may enforce a service plan by applying for a writ of mandamus....").

20. 246 S.W.3d 630.

21. Besides eviscerating the arbitration provision in section 43.056($l$) regarding service-plan enforcement, the Court's holding also nullifies parts of section 43.056(i) above and beyond the arbitration provision itself. For example, subsection (i) features a cost-shifting

## B. The City Says Arbitration Is Possible "Only Under the Narrowest of Circumstances"—Namely, When a City Volunteers

The City's view, at its core, is that a landowner entitled to *request* arbitration is never entitled to *receive* arbitration. Rather, subsection (i) is "an essentially consensual remedy of limited applicability," something vested in the City's absolute discretion.[22] I disagree that cities are only subjected to arbitration if they choose to be. Section 43.052(i), like the identically worded section 43.056(*l* ), grants an actual remedy, not a "consensual" one and not merely a request for one.

The Court's "consensual remedy" holding endorses a path by which cities may circumvent the legislatively preferred three-year plan: "Just Say No"—deny everything and arbitrate nothing. Under this view, if a city (for reasons I cannot imagine) wanted to cede some of its planning authority, it would ignore the petition. But if a city wanted to retain unfettered control, it would deny the petition. Given how cities prize and safeguard their municipal annexation authority,[23] no rational city would ever renounce power by ignoring a petition when it could redouble power by denying it. If the Legislature intended only to authorize cities to volunteer for arbitration, then no statute was necessary as home-rule cities already possess "all the powers of the state not inconsistent with the Constitution, the general laws, or the city's charter."[24] A city that wants to arbitrate something does not need a statute granting it permission. Because "the legislature is never presumed to do a useless act,"[25] we must presume that it intended something more than voluntary arbitration.

More revealing, though, is the City's argument that all this sound and fury about arbitration and inclusion in the city's annexation plan signifies nothing because the fast-track nature of (h)(1) annexations will quickly moot the entire dispute. As the City noted at oral argument: "If the

penalty provision whereby arbitrators can sanction landowners if the petition was "groundless or requested in bad faith or for the purposes of harassment." It is inconceivable, however, that any right-minded city would ever submit to city-funded arbitration of *any* petition, much less a baseless one, if it knew that it could dodge arbitration just by denying the petition outright.

22. At oral argument, the City insisted that a valid arbitration request alone cannot trigger arbitration or justify a court order compelling arbitration:

COURT: So does 43.052 give a private landowner any right at any time under any circumstances to sue for an order compelling arbitration?

RESPONSE: No, it doesn't. . . .

COURT: So even when the city fails to act one way or the other, they sit on it for whatever reason, there is still no private right of action to compel arbitration?

RESPONSE: Well, that's correct. We take that position . . . .

23. Cities regard the broad, unilateral power to annex as a matter of municipal life and death: "According to many national authorities, this annexation power is the primary difference between the flourishing cities of Texas and the declining urban areas in other parts of the nation." *See* HOUSTON, *supra* note 11, at 10.

24. *Proctor v. Andrews*, 972 S.W.2d 729, 733 (Tex.1998) (observing that the Legislature may restrict the power of home-rule cities that derive their plenary power directly from the Constitution); *see also* TEX. CONST. Art. XI, § 5.

25. *Hunter v. Fort Worth Capital Corp.*, 620 S.W.2d 547, 551 (Tex.1981); *see also Travis County v. Pelzel & Assocs., Inc.*, 77 S.W.3d 246, 249–50 (Tex.2002), *superseded by statute*, TEX. LOC. GOV'T CODE § 262.007; *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 485 (Tex.1998).

landowner asks to be included in a three-year plan, the city sits on it, that remedy or rather any consideration of whether it should be in a three-year plan is lost [once the area is annexed]."

The underlying facts illustrate the City's position that all landowner action under subsection (i) is ultimately futile:

- the Estate proposed to the City a high-density housing plan in the City's extraterritorial jurisdiction (ETJ)
- five days later the City directed its staff to begin expeditious (h)(1) annexation (goal: to bring the property within the City limits so it could impose *low*-density development restrictions)
- the Estate then petitioned for inclusion in the City's three-year plan (goal: to delay the (h)(1) annexation so it could vest the property's high-density development plan)

Under the City's position, heads the city wins and tails the landowner loses. The calendar is inexorable. Arbitration is forever a mirage because even if a landowner is theoretically entitled to arbitration, the City's annexation—the very annexation being challenged—zooms along the (h)(1) fast track, thus short-circuiting the dispute.

## C. The City's "Pocket Veto" Analogy Is Facially off the Mark

The City says arbitration is possible in exactly one situation: "when a city refuses to consider or evaluate the request—exercising the proverbial 'pocket veto.' " The pocket-veto analogy is inapposite because a pocket veto, classically understood, quickly yields a definitive outcome: rejection.[26]

Accepting arguendo the City's pocket-veto characterization, the Legislature, unlike the United States Constitution, has failed to define the contours, and the Court avoids addressing these concerns,[27] most notably (1) how much time must elapse before the landowner may request arbitration? and (2) what form of "action" suffices to derail arbitration? [28]

---

**26.** A true pocket veto occurs when the President fails to sign a bill passed by Congress within ten days, if Congress is not in session at the end of those ten days. U.S. CONST. art. I, § 7, cl. 2; *see also The Pocket Veto Case*, 279 U.S. 655, 49 S.Ct. 463, 73 L.Ed. 894 (1929). Timing is the critical element. The President can only kill legislation with a pocket veto if Congress adjourns before the ten days expire; if Congress remains in session, and ten days elapse, then the bill automatically becomes law without the President's signature. U.S. CONST. art. I, § 7, cl. 2.

**27.** 246 S.W.3d 628.

**28.** The City argues that two other Texas statutes use the phrase "fails to take action" to mean "fails to take *any* action" and not overt rejection. *See* TEX. LOC. GOV'T CODE § 232.096 (authorizing commissioner's courts to approve or disapprove plat decisions of a land planning commission and providing that if the court "fails to take action" within thirty days, the commission's decision becomes final); TEX. OCC.CODE § 262.1025 (authorizing the State Board of Dental Examiners to review rules proposed by an advisory committee and providing that if the board fails to take action on the recommendation within ninety days, it must adopt the recommendation). These two statutes are facially different. In both, one governmental body is reviewing the prior decision or proposal of another governmental body; if the reviewing body "fails to take action" for a specified number of days, the prior decision is ratified by operation of law. The annexation statute, by contrast, lacks this critical "deeming" feature. The City's theory leaves the landowner in perpetual limbo since inaction is never treated as either approval or rejection of the landowner's petition, no matter how much time elapses. Meanwhile, the challenged annexation proceeds unabated. The reason the identical phrase "fails to take action" is interpreted differently in these other statutes is because the surrounding language is different in these other statutes. Again, context controls.

Subsection (i) is open-ended and sets no decision-making deadline by which a city must respond to a landowner's petition. If a city sits idle, a landowner has no way of knowing whether the city has merely failed to open its mail or, alternatively, has in fact reviewed the petition but quietly decided not to grant it. What length of city inaction is sufficient before a landowner may seek arbitration? Meanwhile, as the landowner awaits a formal response, the city continues speedily annexing the targeted property under subsection (h)(1).

Moreover, the Court, while purporting to construe "fails to take action" literally, actually spurns its own literalist method. The Court says arbitration is unavailable because the City's categorical refusal amounts to "action." The word "action," however, encompasses a wide range of activities: reviewing a petition, conducting research, convening a hearing, deliberating, etc.[29] Why are these actions not "action"? The Court implicitly limits the word "action" to mean *dispositive* action—when a city formally denies a petition—but the Court cites nothing to explain why *nondispositive* action fails to qualify. By restricting "action" to a yes-or-no decision,[30] the Court has in fact abandoned literalism by reading the statute to mean "fails to take *final* action," a locution that, notably, lawmakers have used elsewhere in the Local Government Code regarding land use regulation, but not here.[31] The Court thus allows context to inform the meaning of "action," but it does so selectively, picking and choosing when it will permit context to guide its statutory analysis.

## III. The Legislature Enacted a Specific Alternative to Quo Warranto in Cases of Alleged Abuse of Subsection (h)(1)

The Court says landowners are no worse off given the possibility of State-initiated quo warranto intervention. The Court reasons that annexation law is largely procedural and that our 1991 decision in *Alexander Oil Co. v. City of Seguin* declared quo warranto the exclusive mechanism to challenge improperly conducted annexations.[32] The Court's analysis is unconvincing.

The Legislature is presumed to understand extant law when it enacts legislation,[33] and if it intended that quo warranto remain a landowner's sole remedy against post–1999 annexation abuses, it would not have enacted a statute that explicitly grants a private arbitration right.[34] This Court recently held that the "truest manifestation" of what lawmakers intended is what lawmakers enacted—the text they actually voted on—and the intent to supersede *Alexander Oil* is found in a statute that does exactly that.[35]

---

29. According to BLACK'S LAW DICTIONARY, "action" means "[t]he process of doing something; conduct or behavior." BLACK'S LAW DICTIONARY 31 (8th ed.2004).

30. *See, e.g.,* 246 S.W.3d 628 ("[T]he city failed to take action on it one way or the other. . . .").

31. The Legislature, for example, says if a county planning commission "fails to take *final* action" on a completed plat application within sixty days, the applicant may seek mandamus relief "to compel the planning commission to approve or disapprove the plat." TEX. LOC. GOV'T CODE § 232.096(g) (emphasis added).

32. 825 S.W.2d 434, 436–37 (Tex.1991).

33. *In re Pirelli Tire, L.L.C.,* 247 S.W.3d 670 (Tex.2007).

34. Again, "the legislature is never presumed to do a useless act." *Hunter v. Fort Worth Capital Corp.,* 620 S.W.2d 547, 551 (Tex. 1981).

We decided *Alexander Oil* in 1991 largely on the basis that the Legislature had not yet given private individuals a way to challenge annexations. Eight years later, the Legislature did so, granting landowners a defined arbitration right.[36] The Legislature, we must presume, understood the role of quo warranto in challenging annexation proceedings when it provided for arbitration in subsection (i), but the Legislature's comprehensive overhaul makes no mention of quo warranto, much less retains the exclusivity of such relief. The City insists the Legislature's failure to unequivocally declare that it was superseding *Alexander Oil* indicates it never intended to do so. We have never required such declarations, and *Alexander Oil* overtly disclaims the necessity for any such declaration: quo warranto, we said in that case, is the way to attack annexation irregularities *unless* the Legislature has "acted to expressly provide a private action."[37] The Legislature did precisely that post-*Alexander Oil*.[38]

This 1999 legislative exception to the general quo warranto rule provides a simple yet substantive remedy that is complete unto itself: the landowner petitions for inclusion in the three-year plan, and if the land is not added, the landowner may seek arbitration. Subsection (i) never states or suggests that quo warranto remains part of the legal landscape or that quo warranto must precede arbitration as an intermediate step.

Finally, the City's reliance on three courts of appeals' decisions construing section 43.052 as strictly procedural, and thus subject only to quo warranto challenge, is misplaced.[39] While those courts held that quo warranto is the sole means to attack a city's alleged violation of 43.052, none of those decisions considered the (h)(1) exemption or interpreted subsection (i), focusing instead on other portions of section 43.052.

The remedy for abuse of the sparsely-populated-area exemption is arbitration, which subsection (i) clearly authorizes.

## IV. Conclusion

The statute in this case speaks for itself. The Court mutes the statute, however, by

35. *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651–52 (Tex.2006).

36. Act of May 31, 1999, 76th Leg., R.S., ch. 1167, § 4, sec. 43.052(i), 1999 Tex. Gen. Laws 4074, 4076–77.

37. *Alexander Oil*, 825 S.W.2d at 437.

38. The Court posits the specter of multiple "individual arbitration proceedings" as another basis for its pro-quo-warranto holding. 246 S.W.3d 629. To be sure, the City and various amici predict calamitous and "drastic implications" if we interpret the statute to provide a private arbitration right. I concede that landowner-invoked arbitration may well saddle cities with real and nonincidental costs. I also understand the City's fear that developers will (1) target areas within the ETJ for dense, out-of-character projects that clash with the city's overall vision for the area and (2) use arbitration under subsection (i) as a delaying tactic or as negotiating leverage. These arguments, however, are rooted in policy and prudential concerns, which are quintessential legislative judgments, not judicial ones. Burdensome or not, the costs and hassles attending arbitration were, I would conclude, presumed acceptable by the Legislature, and in any event, avoidable if cities scrupulously complied with the statute's three-year annexation plan requirement in lieu of successive fast-track annexations under (h)(1).

39. The City cites *Werthmann v. City of Fort Worth*, 121 S.W.3d 803, 807 (Tex.App.-Fort Worth 2003, no pet.); *City of Balch Springs v. Lucas*, 101 S.W.3d 116, 122 (Tex.App.-Dallas 2002, no pet.); *City of San Antonio v. Hardee*, 70 S.W.3d 207, 212 (Tex.App.-San Antonio 2001, no pet.).

fixating on four words divorced from the surrounding statutory framework. I agree judges must adhere to the language that lawmakers voted on, but statutes operate as a whole and must be read as a whole, not as a hodgepodge of isolated fragments. The Court's noncontextual reading is incompatible with related provisions (including one *identical* provision) in the same statute. Literalism can sometimes border on trivialism and should not be confused with textualism, which considers both statutory text and statutory *context* to ascribe meaning. Today's decision is literalism gone bad.

Hughes is statutorily entitled to arbitration, and because the Court "fails to take action" to enforce that remedy, I respectfully dissent.