# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-08-00579-CV

---

**The City of Frisco, Texas, Appellant**

**v.**

**The Commission on State Emergency Communications; Dorothy Marie Morgan and Paul Mallett in their Official Capacities; and North Central Texas Council of Governments, Appellees**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT NO. D-1-GN-04-003690, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

This case involves the interpretation of Chapter 771 of the Texas Health and Safety Code, which addresses the State's administration of a 9-1-1 emergency communications system. *See* Tex. Health & Safety Code Ann. §§ 771.001-.110 (West 2003 & Supp. 2008). The City of Frisco ("Frisco") joined the State's system in 1989 and began providing 9-1-1 services to its residents in 1991. In 2004, Frisco filed a declaratory-judgment suit against the Commission on State Emergency Communications ("the Commission") and certain commission officers, seeking a declaration from the trial court interpreting the statute to say that: (1) Frisco could withdraw from the State's system; (2) once Frisco withdrew, the Commission could no longer collect an emergency service fee from Frisco's residents; and (3) upon Frisco's withdrawal, the Commission was required to distribute to Frisco a portion of the fees the Commission collected from wireless-telephone users.

The parties filed cross-motions for summary judgment, and the trial court granted partial summary judgment for Frisco, declaring that Frisco could withdraw from the State's system, and partial summary judgment for the Commission, declaring that even after withdrawal, Frisco's residents would not be exempted from the State's emergency service fee, and Frisco would not be entitled to a portion of the wireless-telephone fee. Frisco appealed. Because we find no error in the trial court's determinations, we affirm the trial court's order.

**BACKGROUND**

In 1987, the Texas Legislature adopted Chapter 771 of the Texas Health and Safety Code ("the statute"), creating a statewide 9-1-1 emergency communications system and charging the Commission with the administration of the system. *See* Tex. Health & Safety Code Ann. §§ 771.001-.110. Prior to 1987, 9-1-1 systems were administered by local governments, combinations of local governments, and home-rule municipalities, which together provided services to about thirty-nine percent of the state's total population.[1] The statute sought to expand the 9-1-1 services to the rest of the state and implement the State's system through twenty-four existing

---

[1] Because 9-1-1 services were localized before 1987, service gaps existed within the state. In a 1987 report created for the legislature, the Commission found several problems with the systems existing at that time. First, the Commission reported that existing 9-1-1 districts incurred unnecessary costs in re-routing calls from areas where 9-1-1 service was not available. Second, the lack of 9-1-1 service in the unserved areas and the time it took to re-route calls in those areas resulted in a critical loss of time in an emergency situation. Third, the cost of providing 9-1-1 service varied from jurisdiction to jurisdiction, with areas of high-population density enjoying lower average costs than sparsely populated areas. As a result, the Commission recommended a statewide 9-1-1 program to eliminate service-area gaps and allow for subsidization of the cost of 9-1-1 services in the less-populated areas. *See* Advisory Commission on State Emergency Communications, Report with Recommendations to the 70th Texas Legislature (Jan. 1987).

regional planning commissions that were established under Chapter 391 of the Texas Local Government Code. *See* Tex. Loc. Gov't Code Ann. §§ 391.001-.015 (West 2006 & Supp. 2008); Tex. Health & Safety Code Ann. §§ 771.001(10), 771.055 (West 2003). Communities with preexisting 9-1-1 systems became "emergency communication districts" (ECDs) under the statute, and the legislature allowed the ECDs the option of not participating in the State's system. *See* Tex. Health & Safety Code Ann. §§ 771.001(3)(A), 771.071(d) (West 2003), § 771.0711(c) (West Supp. 2008). The legislature also authorized communities to become ECDs under Chapter 772 of the Texas Health and Safety Code, but they had to do so before January 1, 1988.[2] *See* Tex. Health & Safety Code Ann. §§ 771.001(3)(B), 772.104, 772.204, 772.304 (West 2003).

To fund the statewide 9-1-1 system, the legislature initially adopted a two-tiered approach. First, the legislature authorized the Commission to impose an emergency service fee ("the land-line fee") on each local exchange access line in the state with the exception of the customers in an area served by an ECD that was not participating in the State's system. *See id*. § 771.071(a), (d). Second, the legislature authorized the Commission to impose an equalization surcharge on each customer in the state receiving intrastate long-distance service, including those customers in an area served by an ECD that was not participating in the State's system.[3] *See id*. § 771.072(a) (West 2003). In 1997, the legislature added a wireless emergency service fee ("the

---

[2] The City of Lubbock is one example of a community that became an ECD pursuant to Chapter 772. *See Lubbock Emergency Communication Dist. v. Wireless Providers*, No. 07-99-0045-CV, 1999 Tex. App. LEXIS 7784, at *3 (Tex. App.—Amarillo Oct. 19, 1999, pet. denied) (not designated for publication).

[3] This fee, known as the "equalization surcharge," is specifically designed to supplement emergency service fees for regional planning commissions and ECDs that are in need of additional funding.

wireless fee"), authorizing the Commission to impose the fee on each wireless telecommunications connection in the state. *See id*. § 771.0711(a). The statute provides that after collecting the wireless fee each month, the Commission is then required to distribute a portion of the money to each ECD that does not participate in the State's system. *See id*. § 771.0711(c).

Frisco is a home-rule municipality.[4] It joined the State's system in 1989 when it contracted with the North Central Texas Council of Governments ("North Central Council"), one of the regional planning commissions operating in the state, to begin providing 9-1-1 services to its residents. In 2003, Todd Renshaw, Frisco's chief of police and the person responsible for overseeing Frisco's 9-1-1 system, began considering the possibility of Frisco's withdrawal from the State's system so that it could provide its own 9-1-1 service to its residents. In an effort to determine whether the Commission would allow such a withdrawal, Renshaw met with the executive director of the Commission, Paul Mallett, on more than one occasion. Mallett indicated that there were no statutory provisions that would allow the Commission to permit a city to withdraw from the State's system.

---

[4] Home-rule municipalities derive their power from the Texas Constitution. *See* Tex. Const. art. XI, § 5; *State v. Chacon*, 273 S.W.3d 375, 378 (Tex. App.—San Antonio 2008, no pet.). They are essentially "mini-legislatures," with "full authority to do anything the legislature could theretofore have authorized them to do." *Forwood v. City of Taylor*, 214 S.W.2d 282, 286 (Tex. 1948); *Chacon*, 273 S.W.3d at 378. They possess "the full power of self government and look to the [l]egislature not for grants of power, but only for limitations on their power." *In re Sanchez*, 81 S.W.3d 794, 796 (Tex. 2002) (quoting *Dallas Merchant's & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489, 490-91 (Tex. 1993)). They have "all the powers of the state not inconsistent with the Constitution, the general laws, or the city's charter." *City of Galveston v. State*, 217 S.W.3d 466, 469 (Tex. 2007) (quoting *Proctor v. Andrews*, 972 S.W.2d 729, 733 (Tex. 1998)).

4

In November 2004, Frisco filed suit against three parties: the Commission, Mallett in his official capacity as executive director of the Commission, and Dorothy Marie Morgan in her official capacity as presiding officer of the Commission. The defendants later filed a petition to join the North Central Council as a party. Frisco and the Commission filed cross-motions for summary judgment, and the trial court granted partial summary judgment for Frisco, issuing a declaration that Frisco could withdraw from the State's system, and partial summary judgment for the Commission, declaring that once Frisco withdrew, the Commission could continue to collect the land-line fee from Frisco's residents and was not required to give Frisco a portion of the wireless fee.

Frisco appeals from the summary-judgment order in two issues, asserting that the trial court erred in declaring that, even after Frisco withdrew from the State's system, (1) the Commission could continue to assess the land-line fee on Frisco's residents, and (2) the Commission need not give Frisco a portion of the wireless fee.[5]

## STANDARD OF REVIEW

Summary judgments are reviewed de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). When both parties move for summary judgment on the same issues and the trial court grants one and denies the other, the appellate court considers the summary-judgment evidence presented by both sides, determines all questions presented, and if the reviewing court determines that the trial court erred, renders the judgment the trial court should have rendered. *Id*.

---

[5] The Commission has not appealed the trial court's judgment that Frisco is entitled to withdraw from the State's system.

5

The issues raised in this appeal involve statutory construction, which is a question of law that we review de novo. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). In resolving an issue of statutory construction, we are required, first and foremost, to follow the plain language of the statute. *Texas Health Ins. Risk Pool v. Southwest Serv. Life Ins. Co.*, 272 S.W.3d 797, 801 (Tex. App.—Austin 2008, no pet.). We read every word, phrase, and expression in a statute as if it were deliberately chosen, and we presume that words excluded from the statute are done so purposefully. *Gables Realty Ltd. P'ship v. Travis Cent. Appraisal Dist.*, 81 S.W.3d 869, 873 (Tex. App.—Austin 2002, pet. denied). We must read the statute as a whole, rather than just isolated portions, giving meaning to the language that is consistent with other provisions in the statute. *Dallas County Cmty. Coll. Dist. v. Bolton*, 185 S.W.3d 868, 872-73 (Tex. 2005); *Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004).

## DISCUSSION

### *The Land-Line Fee*

In its first issue, Frisco contends that the trial court erred in ruling that the Commission could continue to impose the land-line fee on Frisco's residents even after Frisco withdrew from the State's system. In support of its contention, Frisco makes three arguments, asserting that: (1) the Commission has no statutory authority to impose the land-line fee on non-participating home-rule municipalities; (2) the trial court's ruling creates an absurd result; and (3) the trial court's ruling results in double taxation. We will consider each argument in turn. However, before we do so, we must first address the crux of this issue: the statutory construction of the provisions of the statute referring to the land-line fee.

6

## A. Statutory Construction of Land-Line Fee Provisions

The section of the health and safety code addressing the land-line fee states that "the commission may impose a [land-line] fee on each local exchange access line or equivalent local exchange access line, including lines of customers in an area served by an [ECD] participating in the applicable regional plan." Tex. Health & Safety Code Ann. § 771.071(a). The section also states that "[t]he fee does not apply to an [ECD] not participating in the applicable regional plan. A customer in an area served by an [ECD] not participating in the regional plan may not be charged a fee under this section." *Id*. § 771.071(d).

The plain language of the exclusionary provision excepts only the residents of non-participating ECDs from paying the fee. There is no dispute that Frisco is not an ECD, and none of the language in the provision excepts home-rule municipalities or any other entities that are not ECDs. Thus, for us to conclude that Frisco is exempt from the fee would be for us to read additional language into the statute, which we will not do. *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 628 (Tex. 2008) (quoting *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981)) ("[E]very word excluded from a statute must . . . be presumed to have been excluded for a purpose."). As noted in *Hughes*, there are two significant benefits to reading the statute's language literally and not reading additional language into the statute: (1) we do not risk crossing the line between judicial and legislative powers of government, and (2) we build upon the principle that ordinary citizens should be able to rely on the plain language of a statute to mean what it says. *Id*. Accordingly, based on the plain language of the statute, we conclude that the legislature intended to except only non-participating ECDs from the land-line fee, not non-participating home-rule

7

municipalities, and that Frisco is therefore not excepted from the fee in the event that it withdraws from the State's system.

Further supporting our interpretation is the legislature's reference to home-rule municipalities in several other provisions of the statute. *See* Tex. Health & Safety Code Ann. § 771.055(e) (referring to "home-rule municipalities that operate 9-1-1 systems independent of the state system"), § 771.062(c) (West 2003) (referring to "home-rule municipality that operates a 9-1-1 system independent of the state system"), § 771.0711(g) (referring to "a home-rule municipality . . . created under Chapter 772"). The legislature's other references to home-rule municipalities demonstrate that the legislature was aware of them and could have included them in the exception to the land-line fee if it wanted to do so, yet it did not. *See Fireman's Fund County Mut. Ins. Co. v. Hidi*, 13 S.W.3d 767, 769 (Tex. 2000) ("When the [l]egislature has employed a term in one section of a statute and excluded it in another, we presume that the [l]egislature had a reason for excluding it.").

**B. Commission's Authority to Impose Fee on Frisco**

Although Frisco states its first argument in two different ways—citing to several statutory provisions for the proposition that non-participating home-rule municipalities operate outside the statute and several others for the proposition that the statute provides no authority for the commission to impose the land-line fee on non-participating home-rule municipalities—the arguments can be combined into one: that the legislature had no intention of including non-participating home-rule municipalities in the state's 9-1-1 funding system and that the Commission therefore may not impose the land-line fee on non-participating home-rule municipalities.

8

We begin by considering several sets of statutory provisions cited by Frisco for the proposition that non-participating home-rule municipalities are not included within the funding system in the first place. The first set of provisions includes the following:

> For each state fiscal biennium, the commission shall prepare a strategic plan for statewide 9-1-1 service for the following five state fiscal years using information from the strategic information contained in the regional plans and provided by [ECDs] and home-rule municipalities that operate 9-1-1 systems independent of the state system. Tex. Health & Safety Code Ann. § 771.055(e).

> An [ECD] or home-rule municipality that operates a 9-1-1 system independent of the state system may voluntarily submit strategic planning information to the commission for use in preparing the strategic plan for statewide 9-1-1 service. *Id*. § 771.062(c).

> On receipt of an invoice from a wireless service provider for reasonable expenses for network facilities, including equipment, installation, maintenance, and associated implementation costs, the commission or an emergency services district of a home-rule municipality or an [ECD] created under Chapter 772 shall reimburse the wireless service provider in accordance with state law for all expenses related to 9-1-1 service. *Id*. § 771.0711(g).

None of the cited provisions supports Frisco's position. For example, the first and second provisions, sections 771.055(e) and 771.062(c), provide that the Commission must prepare a strategic plan for statewide 9-1-1 service using information provided by non-participating home-rule municipalities and that the non-participating home-rule municipalities may voluntarily submit the information. *See* Tex. Health & Safety Code Ann. §§ 771.055(e), 771.062(c). The legislature's acknowledgment of non-participating home-rule municipalities and the information they may provide for inclusion in the Commission's strategic plan is irrelevant to the issue of whether non-

9

participating home-rule municipalities are included in the statewide 9-1-1 funding system. The legislature could reasonably include non-participating home-rule municipalities in the strategic planning and also require them to pay the land-line fee. Thus, the two provisions cited by Frisco do not affect our reading of the plain language of the land-line fee provision.

Regarding the third provision, section 771.0711(g), it is also irrelevant to the issue of whether non-participating home-rule municipalities are included in the funding system. Section 771.0711(g) provides that home-rule municipalities must reimburse a wireless service provider for all expenses related to 9-1-1 service. *See id*. § 771.0711(g). That a home-rule municipality must reimburse a wireless service provider does not speak to whether that home-rule municipality must also pay a land-line fee. The legislature could conceivably require only one of the two payments, both of them, or neither. Thus, neither provision affects the other.[6]

Like the first set of provisions cited by Frisco, the second set of provisions also does not support Frisco's proposition that non-participating home-rule municipalities are not included in the funding system of the statute. The second set of provisions states:

> Each regional planning commission shall develop a regional plan for the establishment and operation of 9-1-1 service *throughout the region that the regional planning commission serves*. *Id*. § 771.055(a) (emphasis added by Frisco).

---

[6] We also disagree with Frisco's contention that adopting the Commission's interpretation would render the three cited provisions meaningless. Our interpretation of the land-line fee provision—that the residents of non-participating home-rule municipalities must pay a land-line fee to the Commission—does not nullify the fact that non-participating home-rule municipalities may also provide information to the Commission for inclusion in the Commission's strategic plan or that they may also be required to reimburse wireless service providers.

10

> For each state fiscal biennium, the commission shall prepare a strategic plan for statewide 9-1-1 service for the following five state fiscal years using information from the strategic information contained in the regional plans and provided by [ECDs] and home-rule municipalities that operate 9-1-1 systems independent of the state system. *Id*. § 771.055(e).

The first provision is irrelevant to the issue of the imposition of the land-line fee because the provision does not in any way refer to the fee or to non-participating entities within a regional planning commission region. Regarding the second provision, we have already determined that it does not affect our interpretation of the land-line fee provision.

The third and final set of provisions cited by Frisco in support of its position that non-participating home-rule municipalities are not included within the funding system of the statute are drawn from Chapter 772 of the health and safety code. Chapter 772 addresses local, rather than state, administration of emergency communications. The first provision cited by Frisco states that "[the board of managers of an emergency communication district created under Chapter 288] may impose a 9-1-1 emergency service fee on service users *in the district*." *Id*. § 772.314(a) (West 2003) (emphasis added by Frisco). The second provision states that "[t]he [9-1-1 emergency service] fee must have uniform application and must be imposed *in each participating jurisdiction*." *Id*. § 772.314(b) (emphasis added by Frisco). However, the provisions do not apply to this case. Chapter 772 establishes local ECDs in counties with populations of more than 20,000 and allows certain ECDs to elect not to participate in the State's system. *See id*. §§ 772.301-.329 (West 2003 & Supp. 2008); *Lubbock Emergency Communication Dist.*, 1999 Tex. App. LEXIS 7784, at *3. When the ECDs choose not to participate, they can impose user fees directly on their

11

residents, and the state-imposed fees do not apply. As we have already stated, Frisco is not an ECD. Thus, the cited provisions do not apply to Frisco or otherwise affect our analysis of the land-line fee provisions in Chapter 771, which do apply to this case and which by their plain language do not except non-participating home-rule municipalities from paying the fee.

For the proposition that the Commission has no statutory authority to impose the land-line fee on non-participating home-rule municipalities, Frisco cites another set of provisions. The provisions state:

> [T]he commission may impose a [land-line] fee on each local exchange access line or equivalent local exchange access line, including lines of customers in an area served by an [ECD] *participating in the applicable regional plan*. Tex. Health & Safety Code Ann. § 771.071(a) (emphasis added by Frisco).

> The commission may set the [land-line] fee in a different amount *in each regional planning commission region* based on the cost of providing 9-1-1 service to each region. *Id*. § 771.071(c) (emphasis added by Frisco).

> The [land-line] fee does not apply to an [ECD] not participating in the applicable regional plan. A customer in an area served by an [ECD] not participating in the regional plan may not be charged a fee under this section. *Id*. § 771.071(d).

Frisco asserts that the three provisions limit the Commission's authority for assessing the land-line fee to those entities participating in the State's system. We disagree. The first provision merely states that the local exchange access lines on which the Commission may impose the fee *include* ECDs participating in the State's system, not that they are *limited* to them. The second provision allows the Commission to set the land-line fee at a different amount in each regional planning

12

commission region but does not specifically address non-participating ECDs or home-rule municipalities within those regions. Regarding the third provision, we have already determined that the plain language excepts only non-participating ECDs, not non-participating home-rule municipalities, from paying the land-line fee, and we decline to read additional language into the provision. Thus, none of the provisions limits the Commission's authority for assessing the land-line fee to entities participating in the State's system.

## C. Whether Trial Court's Ruling Creates Absurd Result

In its second argument, Frisco contends that the trial court created an absurd result when it held that a home-rule municipality can choose not to participate in the State's system but must nevertheless pay the land-line fee. In support of its position, Frisco cites *Fleming Foods of Texas, Inc. v. Rylander*, 6 S.W.3d 278, 284 (Tex. 1999), for the proposition that courts should not construe a statute in a way that produces an absurd result. We disagree that the trial court's interpretation creates a result so absurd that the legislature could not have intended it. Allowing entities to withdraw from the State's 9-1-1 system while also refusing to exempt them from the 9-1-1 fees could merely reflect the legislature's intent to create a disincentive for entities to withdraw from the system. The statute represents an ambitious, statewide system that relies on funding received from throughout the state. If Frisco and other local entities were to withdraw from the State's system and take some of the State's funding with them, the system would be placed in jeopardy. Thus, it is reasonable to conclude that the legislature created the statutory scheme as it did with the intention of dissuading local entities from withdrawing from the system. Further, even if we were to assume that the legislature's silence as to non-participating home-rule municipalities in the exclusionary

13

provision could have been an oversight or mistake, it is the legislature, not the courts, that must correct that mistake. *See Brown v. De La Cruz*, 156 S.W.3d 560, 566 (Tex. 2004) ("It is at least theoretically possible that legislators—like judges or anyone else—may make a mistake. That does not give us the power to legislate to fill any hiatus [the legislature] has left."). We therefore reject this argument.

## D. Whether Trial Court's Ruling Results in Double Taxation

In its final argument regarding the land-line fee, Frisco asserts that the trial court's interpretation of the statute will result in double taxation for Frisco's residents. Specifically, Frisco points out that after withdrawing from the State's system and creating its own 9-1-1 system, it would need to impose its own land-line fee on its residents in order to fund its system. Thus, Frisco contends, its residents would have to pay both the State's land-line fee and Frisco's land-line fee in the event of Frisco's withdrawal, amounting to double taxation. However, in Frisco's hypothetical, it would be Frisco, not the statute, creating a new tax for 9-1-1 services. The statute imposes one land-line tax on all state residents with only certain specified exceptions. If Frisco stays within the State's system, its residents are taxed only once. It is only if Frisco withdraws from the system that it must impose a second tax on its residents. In that case, Frisco would choose to tax its residents for a service that the residents could otherwise obtain from the State. Because it would be Frisco, not the statute, imposing a second tax on Frisco's residents in the event of Frisco's withdrawal from the State's system, we reject Frisco's double-taxation argument.

14

**E. Conclusion**

Because the plain language of the statute does not except non-participating home-rule municipalities from paying the land-line fee, and because none of Frisco's arguments persuades us to make a different determination, we conclude that the trial court did not err in holding that the Commission could continue to assess the land-line fee on Frisco's residents after Frisco withdrew from the State's system. We therefore overrule Frisco's first issue.

*The Wireless Fee*

In Frisco's second issue, it challenges the trial court's ruling that even after Frisco withdrew from the State's system, it still would not be entitled to a portion of the wireless fee collected by the Commission. In support of its challenge, Frisco raises two arguments, contending that it should still receive a portion of the wireless fee because: (1) the Commission already distributes a portion of the fee to other non-participating entities, and (2) simple fairness, coupled with the Equal Protection Clause, demands it. We address each argument in turn.

**A. Commission's Distribution of Wireless Fee to Non-Participating Entities**

Frisco first asserts that the Commission's distribution of a portion of the fee to non-participating ECDs and non-participating home-rule cities compels the Commission to distribute a portion of the fee to Frisco after Frisco withdraws from the state system. In support of its assertion, Frisco points to a September 2007 wireless fee distribution report that lists the wireless fees distributed to "9-1-1 Emergency Communication Districts" and "Home Rule Cities." Although Frisco implies that the "Home Rule Cities" referenced in the report are not ECDs, the Commission

15

contends the opposite. As evidence for its assertion, the Commission references an affidavit prepared by Mallett, the Commission's executive director, in which Mallett states that the "Home Rule Cities" referenced in the distribution report are in fact ECDs established under section 771.001(3)(A) of the Texas Health and Safety Code.[7] In his affidavit, Mallett further explains that the Commission and members of the 9-1-1 community "historically referred to § 771.001(3)(A) ECDs by the terms 'Home Rule Cities' or 'HRCs' because, of the 27 entities fitting the definition, all but one are indeed home-rule cities. The exception is the Dallas County Sheriff's Department, which is not a home-rule city but does fit the definition of an ECD under § 771.001(3)(A)."

Frisco's argument requires us to construe the provisions of the statute addressing the wireless fee. The provisions state:

> To provide for automatic number identification and automatic location identification of wireless 9-1-1 calls, the commission shall impose on each wireless telecommunications connection a 9-1-1 emergency service fee. Tex. Health & Safety Code Ann. § 771.0711(a).

> Not later than the 15th day after the end of the month in which the money is collected, the commission shall distribute to each [ECD] that does not participate in the state system a portion of the money that bears the same proportion to the total amount collected that the population of the area served by the district bears to the population of the state. *Id*. § 771.0711(c).

---

[7] Section 771.001(3)(A) defines an ECD as "a public agency or group of public agencies acting jointly that provided 9-1-1 service before September 1, 1987, or that had voted or contracted before that date to provide that service." Tex. Health & Safety Code Ann. § 771.001(3)(A) (West 2003).

16

In reviewing the plain language of the statute, as is required by the rules of statutory construction, we note that the Commission's distribution of wireless fees to all non-participating ECDs is consistent with the plain language of section 771.0711(c), which states that the Commission must distribute a portion of the wireless fee "to each [ECD] that does not participate in the state system." *See id*. Further, as we previously noted, the fact that the legislature referenced home-rule municipalities in other provisions of the statute but not the provisions here lends additional support to our interpretation. *See Fireman's Fund*, 13 S.W.3d at 769. Because the plain language of the statute includes only non-participating ECDs in the wireless-fee distribution, and because there is no dispute that Frisco is not an ECD, we reject Frisco's argument.

## B. Equal Protection Clause

In its second argument regarding the wireless fee, Frisco asserts that "simple fairness under the law, bolstered by the requirements of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution," demands that the Commission distribute a portion of its wireless fee to Frisco after Frisco's withdrawal from the State's system. Aside from a general reference to the equal-protection clause, Frisco does not cite to any legal authority in support of its argument, nor does it explain how the Commission's position allegedly violates the equal-protection clause. Instead, Frisco merely explains that the wireless fee must be assessed against all wireless connections because wireless customers are mobile, necessitating the possible provision of 9-1-1 services to them outside the area in which they pay their land-line fee, and then contends that Frisco should receive a portion of the wireless fee after it withdraws from the State's system because it will still need to provide 9-1-1 services to wireless customers traveling within its

17

jurisdiction. Frisco further asserts that it would be the only entity in the state not to receive a portion of the wireless fee if it withdrew from the State's system and that its receipt of a portion of the wireless fee "makes sense" and is the "only fair result." Yet, regardless of how many ways Frisco might phrase its arguments, none of Frisco's contentions changes the plain language of the statute or causes us to be willing to read additional language into the statute. The statute provides that the Commission must distribute a portion of the wireless fees to non-participating ECDs. Frisco is not an ECD and is therefore not entitled to a portion of the fees. Whether the provision is fair or makes the most sense are questions for the legislature to consider, not the courts. *See Hughes*, 246 S.W.3d at 629 ("[O]ur standard for construing statutes is not to measure them for logic [but to] construe [them] to effectuate the intent of the [l]egislature, with the language of the statute as it was enacted to be our guide unless the context or an absurd result requires another construction.") Accordingly, we reject Frisco's argument and overrule its second issue.

## CONCLUSION

Because we conclude that the trial court did not err in granting partial summary judgment for the Commission, we affirm the trial court's order.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Puryear and Henson

Affirmed

Filed:  July 9, 2009

18