# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00475-CV

**Texans Uniting for Reform and Freedom, Appellant**

**v.**

**Amadeo Saenz, Jr., P.E., Individually and in his Official Capacity as Executive Director of the Texas Department of Transportation; Coby Chase, Individually and in his Official Capacity as Director of the Texas Department of Transportation Government and Public Affairs Division; Texas Department of Transportation; and Texas Transportation Commission, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT NO. D-1-GN-07-003165, HONORABLE PAUL DAVIS, JUDGE PRESIDING

## C O N C U R R I N G   O P I N I O N

In this interlocutory appeal, appellant Texans Uniting for Reform and Freedom ("TURF") challenges the trial court's order granting the plea to the jurisdiction filed by appellees Amadeo Saenz, Jr., P.E., individually and in his official capacity as Executive Director of the Texas Department of Transportation; Coby Chase, individually and in his official capacity as Director of the Texas Department of Transportation Government and Public Affairs Division; Texas Department of Transportation; and Texas Transportation Commission ("TxDOT"). On this record and these pleadings, I concur in the majority's judgment affirming the trial court's order granting the plea to the jurisdiction.

*Background*

TURF is a non-profit organization whose stated mission is "to educate the public about and organize the public against TxDOT's new shift to tolling as the primary method to finance road construction." In 2007, TURF filed suit against TxDOT seeking to enjoin the use of public money for a political and lobbying campaign.[1] TURF's pleadings alleged that TxDOT's expenditure of public funds for the "Keep Texas Moving" campaign amounted to lobbying and engaging in political activities by a state agency in violation of chapter 556 of the government code. TURF sought declaratory and injunctive relief. *See* Tex. Gov't Code Ann. §§ 556.001-.009 (West 2004).

Included among the allegations in TURF's petition were the following assertions:

- TxDOT launched a political campaign called "Keep Texas Moving" ("KTM") in an attempt to advocate a public policy of tolling most roads in Texas.

- TxDOT has sought to influence this political issue with its KTM campaign.

- Unlike purely educational efforts such as the "Don't Mess With Texas" campaign, the KTM campaign is a one-sided attempt to advocate one political point of view on a highly controversial matter that is far from politically decided.

- TxDOT has hired lobbyists and openly lobbied local, state and federal officials in support of TxDOT's desire to toll existing federal interstate highways and other tolling initiatives that are not yet in development.

- [T]he KTM campaign and the lobbying campaign constitute state-agency sponsored political advocacy and lobbying that are prohibited by § 556.001 et seq. of the Texas Government Code and 5 U.S.C. [§] 1501 et seq.

---

[1] The named plaintiff in TURF's original petition was Executive Director Terri Hall. TURF was substituted as the sole named plaintiff in the second amended petition filed on October 18, 2007.

2

TxDOT filed a plea to the jurisdiction, and TURF filed a motion for continuance. On October 18, 2007, the trial court granted a 90-day continuance. The hearing on TxDOT's plea to the jurisdiction was ultimately held on March 20, 2008. During the intervening period, the parties amended their pleadings[2] and conducted discovery. As part of this discovery, TURF conducted depositions of four TxDOT employees—Executive Director Amadeo Saenz, Director of the Government and Public Affairs Division Coby Chase, Helen Havelka, and Ted Houghton. In support of the allegations in its petition, TURF submitted evidence to the trial court, including excerpts from these depositions, multiple affidavits from TURF's Executive Director Terri Hall, printouts from the Keep Texas Moving website, and other documents to support the allegations in its pleadings. TxDOT also submitted evidence in support of its plea to the jurisdiction, including excerpts from depositions of Mr. Chase and Ms. Havelka, and an affidavit from Ms. Havelka.

On the morning of March 20, 2008, prior to the hearing on TxDOT's plea to the jurisdiction, TURF filed another motion for continuance seeking additional time for discovery. The trial court denied TURF's motion for continuance and took the plea to the jurisdiction under advisement. After the hearing, TURF filed a motion to supplement the record to include the "Fourth Supplemental Affidavit of Terri Hall (with attachments)." After reviewing the pleadings and considering the admissible evidence of jurisdictional facts, the trial court granted TURF's motion to supplement the record and granted TxDOT's plea to the jurisdiction.

---

[2] The live pleadings before the trial court on March 20, 2008, were TURF's "Third Amended Original Petition and Application for Injunctive Relief, Including Temporary Restraining Order" and TxDOT's "Second Amended Plea to the Jurisdiction."

3

*Plea to the Jurisdiction*

On appeal, TURF argues that the trial court erred in granting TxDOT's plea to the jurisdiction. Specifically, TURF argues that the trial court had jurisdiction over its claims under the Uniform Declaratory Judgments Act (the UDJA) because Amadeo Saenz, the Executive Director of TxDOT, and Coby Chase, the Director of the TxDOT Government and Public Affairs Division, acted outside their legal authority by spending appropriated funds to hire a lobbyist and engaged in lobbying and political activities designed to support the use of toll roads in Texas, including the Trans-Texas Corridor, in violation of chapter 556 of the government code and the federal Hatch Act. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.009 (West 2008) (Uniform Declaratory Judgments Act); Tex. Gov't Code Ann. §§ 556.001-.009 (concerning political activities by state agencies and employees); 5 U.S.C. §§ 1501-08 (2007) (federal Hatch Act concerning political activities of certain state and local employees). The UDJA allows a person "whose rights, status, or other legal relations are affected by a statute" to "have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations thereunder." Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a).

TURF has asserted *ultra vires* claims. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009).[3] "To fall within this *ultra vires* exception, a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the

---

[3] Because TURF has not shown a waiver of sovereign immunity against the Texas Department of Transportation or the Texas Transportation Commission, I agree with the majority that the trial court did not err by granting TxDOT's plea to the jurisdiction as to those state agencies. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 (Tex. 2009).

4

officer acted without legal authority or failed to perform a purely ministerial act." *Id.* Because TURF has alleged *ultra vires* claims, I construe the relevant statutory provisions in light of the facts pleaded and evidence submitted by the parties to determine as a matter of law whether an *ultra vires* act is in fact alleged. *See id.*; *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008) (rules of statutory construction discussed); *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226-27 (Tex. 2004).

### A. Section 228.004

Transportation code section 228.004 authorizes TxDOT "to promote the development and use of toll projects." Tex. Transp. Code Ann. § 228.004 (West Supp. 2009). To carry out this legislative mandate, section 228.004 expressly authorizes TxDOT to "engage in marketing, advertising, and other activities" and to "enter into contracts or agreements necessary to procure marketing, advertising, or other promotional services from outside service providers." *Id.* The plain language of section 228.004 evidences a clear grant of discretion to TxDOT to promote the development and use of toll projects by "engag[ing] in marketing, advertising, and other activities." *Id.*; *see also City of Rockwall*, 246 S.W.3d at 625-26.

Contrary to TURF's allegations, the record reflects that the "Keep Texas Moving" campaign was a public information program implemented by TxDOT to promote the development and use of toll projects. Ms. Havelka averred that the Keep Texas Moving campaign was "a statewide public information effort to inform and educate the public about improving the transportation needs in Texas." To the extent TURF alleges that the sole purpose of the Keep Texas Moving campaign was to advocate and promote the use of toll roads in Texas, including the

5

Trans-Texas Corridor, such allegations and purpose are consistent with the Legislature's approval of toll roads in general—and more specifically the Trans-Texas Corridor in chapter 227 of the transportation code—and TxDOT's authority to promote the development and use of toll projects in section 228.004. *See* Tex. Transp. Code Ann. §§ 227.001-.083, 228.004 (West Supp. 2009). As a matter of law TURF has failed to plead or present evidence creating a fact issue of an *ultra vires* act with regard to section 228.004. *See Heinrich*, 284 S.W.3d at 372; *Miranda*, 133 S.W.3d at 227-28.

B.      *Section 556.004*

Section 556.004 of the government code precludes a state agency from participating in political activities such as using appropriated funds to support a candidate for office. *See* Tex. Gov't Code Ann. § 556.004. TURF argues that the "Keep Texas Moving" campaign was a lobbying campaign designed to achieve a political purpose in violation of section 556.004(c) because TxDOT used the Keep Texas Moving campaign to achieve a political purpose. *See id.* § 556.004(c).[4] In support of this argument, TURF points to evidence "that the campaign in question advances toll roads and public-private partnerships as the only solution to Texas' transportation needs" and "uses false information to advance toll roads as the only solution to Texas' transportation needs." Among

---

[4] Section 556.004(c) of the government code provides:

(c)     A state officer or employee may not use official authority or influence or permit the use of a program administered by the state agency of which the person is an officer or employee to interfere with or affect the result of an election or nomination of a candidate or to achieve any other political purpose.

Tex. Gov't Code Ann. § 556.004(c) (West 2004).

6

other things, TURF alleges that there is evidence of "overt political activities" such as "[p]urchasing the 'keeptexasmoving.com' domain name from a pro-toll political organization" and "[h]iring political consultants and lobbyists to craft pro-toll messages" for use on the Keep Texas Moving website and in radio and television advertising.

The principal question is what the Legislature intended when it barred state officials and employees from using state programs to achieve a political purpose. *See id*. The statute does not define the phrase "political purpose." *See id.* § 556.004. However, read in the context of the entire provision as well as other provisions in chapter 556, section 556.004(c)'s prohibition against using a program administered by a state agency "to achieve any other political purpose" does not prohibit the type of public information effort exemplified by the Keep Texas Moving campaign. *See generally id.* §§ 556.004-.006; *see also Phillips v. Bramlett*, 288 S.W.3d 876, 880 (Tex. 2009) (courts should read statutes as a whole and interpret them to give effect to every part); *Jones v. Fowler*, 969 S.W.2d 429, 432 (Tex. 1998) (same). Accordingly, I construe this prohibition to be directed at preventing a state agency from using state programs and resources to influence the result of an election or nomination of a candidate for public office or to influence the passage or defeat of a legislative measure. *See* Tex. Gov't Code Ann. §§ 556.004(c), .006(a). Stated differently, section 556.004 precludes state agencies from engaging in partisan political activities.[5]

---

[5] This construction is similar to the federal courts' construction of the federal Hatch Act, *see United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers*, 413 U.S. 548, 568-74 (1973) (explaining Congress intended only a "general proscription against partisan activities" in the Hatch Act), which I address more fully below.

Accepting all of TURF's allegations and evidence as true, nothing in the record reflects that the Keep Texas Moving campaign was used in a manner prohibited by section 556.004. I would conclude as a matter of law that TURF has failed to plead or present evidence creating a fact issue of an *ultra vires* act with regard to section 556.004. *See Heinrich*, 284 S.W.3d at 372; *Miranda*, 133 S.W.3d at 227-28.

C.     *Section 556.005*

The plain language of section 556.005(a) precludes a state agency from hiring a person who is required to register as a lobbyist under chapter 305. Tex. Gov't Code Ann. § 556.005(a); *City of Rockwall*, 246 S.W.3d at 625-26.[6] The record reflects that TxDOT entered into an agreement with the Rodman Company to provide services for the Keep Texas Moving campaign; the Rodman Company used the services of Gary Bushell, LLP; and Gary Bushell, LLP, is registered as a lobbyist under chapter 305 of the government code. The issue then is whether the Rodman Company's use of services provided by Gary Bushell, LLP, violates the prohibition in section 556.005(a) against state agency employment of a person who is required to register as a lobbyist under chapter 305.

_____

[6] Section 556.005(a) states:

(a)     A state agency may not use appropriated money to employ, as a regular full-time or part-time or contract employee, a person who is required by Chapter 305 to register as a lobbyist. Except for an institution of higher education as defined by Section 61.003, Education Code, a state agency may not use any money under its control to employ or contract with an individual who is required by Chapter 305 to register as a lobbyist.

Tex. Gov't Code Ann. § 556.005(a) (West 2004).

Chapter 305 of the government code requires that a person who receives compensation for communicating directly with members of the state legislative or executive branch in order to influence legislation file a written statement of registration identifying the entities or persons he represents and the amount of compensation received for his services. *See* Tex. Gov't Code Ann. §§ 305.003-.005 (West 2005 & Supp. 2009). TURF alleges that Gary Bushell, LLP, was hired to assist TxDOT "in seeking approval of local officials for tolling and the Trans-Texas Corridor/I-69 toll road." Accepting TURF's allegations as true, I cannot conclude that TxDOT's actions violated section 556.005 because the Rodman Company, not TxDOT, hired Gary Bushell, LLP, and communicating with local officials—and conducting "town hall" meetings—does not require registration under Chapter 305. On these facts, I cannot conclude that TxDOT officials acted outside their authority under section 556.005 in hiring the Rodman Company, who utilized the services of Gary Bushell, LLP, to communicate with local officials and conduct town hall meetings in connection with the Keep Texas Moving campaign. I would conclude as a matter of law that TURF has failed to plead or present evidence creating a fact issue of an *ultra vires* act under section 556.005. *See Heinrich*, 284 S.W.3d at 372; *Miranda*, 133 S.W.3d at 227-28.

D.     *Section 556.006*

Section 556.006 prohibits a state agency from using appropriated funds to attempt to influence the passage or defeat of a legislative measure. Tex. Gov't Code Ann. § 556.006.[7] There

_____

[7] Section 556.006 provides:

(a)     A state agency may not use appropriated money to attempt to influence the passage or defeat of a legislative measure.

9

is nothing in the record to demonstrate that TxDOT officials used the Keep Texas Moving campaign to influence the passage or defeat of a legislative measure. The Legislature enacted legislation approving the concept of the Trans-Texas Corridor in 2003. *See generally* Tex. Transp. Code Ann. §§ 227.001-.083. Thus, TxDOT officials could not have used the Keep Texas Moving campaign, which was not developed until 2006 or implemented until late 2007, to influence the passage of legislation in 2003. TURF has not alleged that the Keep Texas Moving campaign was used to influence the passage or defeat of any other legislative measure. Moreover, the deposition testimony from Ms. Havelka, the TxDOT employee who managed the Keep Texas Moving campaign, reflects that it was a public information tool to educate the public about the use of toll roads and to encourage the public to attend the public hearings regarding the use of toll roads. Chapter 227 of the transportation code required TxDOT to hold public hearings and seek public input on the development of the Trans-Texas Corridor. *See id*. § 227.013 (West Supp. 2009). In addition, section 556.006(b) expressly provides that state officers or employees are not prohibited from using state resources to provide public information or to provide information in response to a request. Tex. Gov't Code Ann. § 556.006(b). Under these circumstances and on this record, I would conclude as a matter of law that TURF has failed to plead or present evidence creating a fact issue of an *ultra vires* act in connection with section 556.006.

---

(b)     This section does not prohibit a state officer or employee from using state resources to provide public information or to provide information responsive to a request.

*Id.* § 556.006.

E.      *Federal Hatch Act and Lobbying*

In support of its allegations that TxDOT officials have violated the federal Hatch Act, TURF alleges that TxDOT officials "have directed the expenditure of public funds to lobby the United States Congress in favor of a policy of expanding toll roads and tolling existing interstate highways." TURF further alleges that "the Keep Texas Moving campaign and lobbying campaign constitute state agency-sponsored political advocacy and lobbying that is prohibited by § 556.001 et seq. of the Texas Government Code and 5 U.S.C. [§] 1501 et seq." TURF argues that such activities violate the federal Hatch Act and, more specifically, 5 C.F.R. § 151.121, which provides that "[a] State or local officer or employee may not . . . [d]irectly or indirectly coerce, attempt to coerce, command, or advise a State or local officer or employee to pay, lend, or contribute anything of value to a political party, committee, organization, agency, or person for a political purpose." *See* 5 C.F.R. § 151.121(b) (2010); *see also* Tex. Gov't. Code Ann. § 556.0055 (providing restrictions on lobbying expenditures).

As noted above, however, federal courts, including the United States Supreme Court, have construed the federal Hatch Act narrowly to circumscribe only *partisan* political activities—i.e., activities directed toward the success of a political party. *See United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers*, 413 U.S. 548, 568-74 (1973); *Bauers v. Cornett*, 865 F.2d 1517, 1524 (8th Cir. 1989). As explained by the Supreme Court in *Letter Carriers*, the prohibition against political activity is not to be construed to prohibit political activity in nonpartisan elections or in connection with questions not specifically identified with any national or state

11

political party, such as "questions relating to constitutional amendments, referendums, approval of municipal ordinances, and others of a similar character . . . ." *Letter Carriers*, 413 U.S. at 562.

Although TURF alleges that the Keep Texas Moving campaign constitutes lobbying and political advocacy in violation of the federal Hatch Act, it does not allege that such activities are partisan activities directed toward the success of a political party. Nor does TURF point to any evidence in the record that suggests that TxDOT's activities, including the Keep Texas Moving campaign, were directed toward the success of a political party. I conclude as a matter of law that TURF has failed to plead or present evidence creating a fact issue of an *ultra vires* act on the part of TxDOT officials in violation of the federal Hatch Act.

With respect to its allegations that TxDOT officials have engaged in lobbying in violation of chapter 556 of the government code, I likewise construe the restrictions in chapter 556 to be directed at partisan political activities. *See id.* Because TURF has not alleged that TxDOT officials have engaged in partisan political activities directed toward the success of a political party, I conclude that TURF has failed to allege an *ultra vires* act on the part of TxDOT officials in violation of the lobbying restrictions in chapter 556 of the government code. Nor has TURF presented evidence creating a fact issue of an *ultra vires* act in connection with the lobbying restrictions in chapter 556 of the government code.

Having reviewed the relevant statutory provisions in light of TURF's allegations and concluded as a matter of law that TURF has failed to plead or present evidence creating a fact issue of an *ultra vires* act on the part of TxDOT officials in developing and implementing the Keep Texas Moving campaign to promote the development of toll projects, I conclude that TURF has not shown

a waiver of sovereign immunity and, therefore, the trial court lacked jurisdiction over TURF's UDJA claims and properly granted TxDOT's plea to the jurisdiction.[8]

*Taxpayer Standing*

To the extent TURF asserts taxpayer standing to bring its claims against TxDOT, as the majority observes, it is well settled that once a challenged expenditure has been made—even assuming that the claim against such expenditure is meritorious—a complaining taxpayer no longer has standing to sue. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 556 (Tex. 2000). As the supreme court explained in *Bland*, the justification for allowing taxpayer suits to enjoin the performance of illegal agreements is that the interference posed by such suits is slight compared to the protection afforded taxpayers from preventing the culmination of illegal agreements made by public officials. *Id.* at 558. But, once the governmental entity has made the complained-of expenditures, the balance of costs and benefits in allowing taxpayer suits shifts significantly. After the expenditures have been made, allowing taxpayer standing to challenge those expenditures threatens to interfere substantially with other taxpayers' settled expectations. *Id.*

The record reflects that the Keep Texas Moving campaign originated during 2006 with creative development of the campaign. The media placement, advertising, and informational website began airing to the public in June 2007. TURF filed suit in September 2007, four months after the launch of the public information effort. The work plan with Thompson Marketing and

---

[8] Because I conclude the trial court lacked jurisdiction to consider TURF's claims, I agree with the majority that we need not reach other arguments raised by TxDOT, including that the case is moot.

media placement for the Keep Texas Moving campaign ended September 30, 2007, leaving only repayment for these services to be made. Allowance of a taxpayer action to prohibit payment for these services, which have already been rendered, threatens substantial interference with governmental actions and other taxpayers' settled expectations. *See id.* at 556-57. Because standing is a component of subject matter jurisdiction, I agree with the majority that the trial court properly granted TxDOT's plea to the jurisdiction against TURF's claims of taxpayer standing.[9] *See Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993).

Finding no error in the trial court's order granting TxDOT's plea to the jurisdiction and denying TURF's motion for continuance, I concur in the majority's judgment affirming the trial court's order.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Pemberton and Waldrop

Filed: August 20, 2010

---

[9] The same analysis applies to TxDOT's expenditures for the "Forward Momentum" report published in February 2007 and the work already performed by the Rodman Company with the assistance of Gary Bushell, LLP.