# NO. 12-13-00097-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *PATRICK KITTMAN,* *APPELLANT* | *§* | *APPEAL FROM THE 273RD* |
| *V.* | *§* | *JUDICIAL DISTRICT COURT* |
| *HOLLY KAY MILLER,* *APPELLEE* | *§* | *SABINE COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

Appellant Patrick Kittman appeals the trial court's order in a suit to modify the parent-child relationship. On appeal, he presents two issues. We reverse and remand.

### BACKGROUND

Patrick Kittman and Holly Kay Miller are the parents of two children, C.T.K., born May 15, 1999, and C.W.K., born January 19, 2004. Patrick and Holly were divorced on July 9, 2010, and were appointed joint managing conservators of the children. Holly was granted the exclusive right to designate the primary residence of the children within the Hemphill Independent School District. Moreover, Patrick and Holly agreed to specific terms of possession not in compliance with a standard possession order.

Holly married Jessie Miller on September 25, 2010. On January 6, 2011, she filed a petition to modify the parent-child relationship, requesting that the geographic restriction on the children's primary residence be removed, and that Patrick's visitation be modified to comply with a standard possession order. On May 5, 2011, Patrick filed a second amended answer, a counterpetition to modify the parent-child relationship, and a motion for an immediate protective order and custody of the children. Specifically, he requested that he be appointed as the

conservator with the right to designate the primary residence of the children, and that he be designated as sole managing conservator of the children. Further, Patrick contended that Jessie had a history or pattern of regularly committing family violence during the past fourteen years and a history or pattern of child, sexual, and physical abuse against his first two wives, a daughter, two adopted daughters, and an extramarital sexual consort. Thus, he requested a protective order against Jessie, and that any visitation by Holly be supervised.

Before trial, the court filed an amended temporary and protective order, finding that it was in the children's best interest that Patrick be appointed temporary sole managing conservator of the children pending final hearing because the children's present circumstances would significantly impair their "physical, [sic] health, or emotional development." The trial court ordered that Patrick have the exclusive right to designate the primary residence of the children, and that Holly have possession of the children during the summer as designated by the trial court and in accordance with a standard possession order during the school term. Further, the trial court ordered that Jessie be enjoined from communicating in any manner, directly or indirectly, "and/or being around the children."

On February 25, 2013, a jury trial was held. At the conclusion of the trial, the jury found that the final decree of divorce should not be modified to appoint Patrick as the conservator with the exclusive right to designate the children's primary residence. The jury also found that the geographic restriction in the final decree of divorce should not be removed or changed. Thus, the trial court rendered an order denying Patrick's request that he be named as the conservator with the right to designate the children's primary residence, and denying Holly's request to modify the geographic restriction of the children's primary residence. This appeal followed.

## EXCLUSION OF DOMESTIC VIOLENCE EVIDENCE

In his first issue, Patrick argues that the trial court erred by excluding evidence of Jessie Miller's domestic violence that occurred more than two years prior to the filing of the suit. More specifically, Patrick contends that the trial court improperly construed Section 153.004 of the Texas Family Code.

### Standard of Review

Statutory construction is a legal question that we review de novo. *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010); *City of Rockwall v. Hughes*,

246 S.W.3d 621, 625 (Tex. 2008). In construing statutes, our primary objective is to give effect to the legislature's intent. *Tex. Lottery Comm'n*, 325 S.W.3d at 635. Where the text is clear, the text is determinative of that intent. *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009). We construe the statute's words according to their plain and common meaning. *City of Rockwall*, 246 S.W.3d at 625. In construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider, among other matters, the object sought to be attained, circumstances under which the statute was enacted, legislative history, and the common law or former statutory provisions, including laws on the same or similar subjects. TEX. GOV'T CODE ANN. § 311.023(1)-(4) (West 2013). We presume that the legislature was aware of existing law and acted with reference to it. *Acker v. Tex. Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990). We must presume that every word of the statute has been used for a purpose and that every word excluded from the statute has been excluded for a purpose. *Laidlaw Waste Sys., Inc. v. City of Wilmer*, 904 S.W.2d 656, 659 (Tex. 1995).

Evidentiary rulings are committed to the trial court's sound discretion. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007). We review a trial court's decision to admit or exclude evidence for an abuse of that discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). A trial court abuses its discretion when it acts without reference to any guiding rules and principles. *Garcia v. Martinez*, 988 S.W.2d 219, 222 (Tex. 1999). We must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

To obtain reversal of a judgment based on a trial court's error in admitting or excluding evidence, the complaining party must show that (1) the trial court committed an error, and (2) the error was reasonably calculated to cause, and probably did cause, rendition of an improper judgment. *State v. Central Expressway Sign Assoc.*, 302 S.W.3d 866, 870 (Tex. 2009); *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989); *see also* TEX. R. APP. P. 44.1(a)(1). In determining if the excluded evidence probably resulted in the rendition of an improper judgment, a successful challenge to a trial court's evidentiary rulings requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded or admitted. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001).

Any error in excluding evidence is harmless if other admitted evidence reveals the same facts as that which was excluded. *Bryant v. Transcon. Gas Pipe Line Corp.*, 821 S.W.2d 187,

3

188 (Tex. App.—Houston [14th Dist.] 1991, writ denied).  Moreover, no reversible error exists if the evidence in question is cumulative or is not controlling on a material, dispositive issue. *Roberts v. Clark*, 188 S.W.3d 204, 208 (Tex. App.—Tyler 2002, pet. denied); *see also **Nissan Motor Co., Ltd. v. Armstrong***, 145 S.W.3d 131, 144 (Tex. 2004) ("Clearly, erroneous admission is harmless if it is merely cumulative.").  We determine whether the case turns on the challenged evidence by reviewing the entire record.  *Gillespie v. Gillespie*, 644 S.W.2d 449, 450 (Tex. 1982).

**Applicable Law**

This case is a suit for modification of the parent-child relationship governed by Section 156.101 of the Texas Family Code.  *See* TEX. FAM. CODE ANN. § 156.101 (West Supp. 2012).  A court may modify an order that provides for the appointment of a conservator of a child, that provides the terms and conditions of conservatorship, or that provides for the possession of or access to a child if modification would be in the best interest of the child and the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed.  *See **id**.* § 156.101(a) (West Supp. 2012).  The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child. *See **id**.* § 153.002 (West 2008).  An adult person's future conduct may well be measured by his recent deliberate past conduct as it may be related to the same or a similar situation.  *Wallace v. Fitch*, 533 S.W.2d 164, 167 (Tex. Civ. App.—Houston [1st Dist.]1976, no writ); *De Llano v. Moran*, 333 S.W.2d 359, 361 (Tex. 1960).  "Oftentimes, past is prologue" and, therefore, past violent conduct can be competent evidence.  *In re Epperson*, 213 S.W.3d 541, 544 (Tex. App.—Texarkana 2007, no pet.).

Here, the statute at issue is Section 153.004(a) of the Texas Family Code, which states as follows:

> In determining whether to appoint a party as a sole or joint managing conservator, the court shall consider evidence of the intentional use of abusive physical force by a party against the party's spouse, a parent of the child, or any person younger than eighteen years of age committed within a two year period preceding the filing of the suit or during the pendency of the suit.

*See* TEX. FAM. CODE ANN. § 153.004(a) (West 2008).  We note that Chapter 153 and Chapter 156 are distinct statutory schemes that involve different issues.  *In re V.L.K.*, 24 S.W.3d 338, 343 (Tex. 2000).  Chapter 156 modification suits raise additional policy concerns such as

4

stability for the child and the need to prevent constant litigation in child custody suits. *Id.* The legislature has determined that the standard and burden of proof are different in original and modification suits. *Compare* TEX. FAM. CODE ANN. § 153.134 (West 2008) (providing that court may render order appointing parents as joint managing conservators if in best interest of child and other factors, primarily involving ability of parents to share decision making and accept other parent's relationship with child) *with* TEX. FAM. CODE ANN. § 156.101 (allowing court to modify order if in best interest of child and circumstances of child, conservator, or other party affected by order have materially and substantially changed).

## Objections and Evidentiary Rulings

At trial, Holly's attorney objected when Patrick's attorney began cross examining Jessie Miller about his relationship with his children and his prior marriages. Holly objected that Jessie's relationships with his children and prior wives were barred by res judicata and irrelevant. Patrick responded that Jessie's alleged history of domestic violence was relevant to how he might act in the future, and to the best interest of the children. Patrick also contended that Jessie was not a party to the divorce and, thus, res judicata did not apply to him. The trial court stated that it would consider Patrick's request that he be allowed to ask questions regarding Jessie's alleged prior domestic violence.

After Holly rested her case, the trial court stated that "the history of domestic violence is covered by Section 153.004." Even though the trial court recognized that Section 153.004 pertained to parties, it stated that Jessie was a person "with the party, being the husband." Additionally, the trial court referred to the statute's restriction of domestic violence evidence to that committed within a two year period preceding the filing of the suit. Patrick's attorney pointed out that Section 153.004 dealt with domestic violence by parties, and that there is no two year restriction regarding domestic violence pertaining to the best interest of the children. Finally, he argued that any evidence affecting the welfare of the children was relevant without regard to a time restriction. The trial court ruled that it was "going to go along with Section 153.004 and limit domestic violence evidence" from the date the suit was filed. In other words, the trial court limited all domestic violence evidence allegedly committed by Jessie that occurred before January 6, 2009.

**Bill of Exception Testimony**

After the trial court's ruling, Patrick's attorney requested a bill of exception for the testimony of two witnesses outside the presence of the jury. Patrick's first witness was Jenee Miller. Jenee testified that she lived in Alabama, and was married to Jessie, but could not remember the year. She stated that she and Jessie divorced in July of 2001 or 2002, and had one child, Lindsey. She described her marriage as "horrible" and stated that it included domestic violence. Jenee testified that the domestic violence started when she was eight months pregnant with Lindsey between December of 1993 and February of 1994. She stated that during this first incident, they were arguing when he pushed her down. She said that Jessie hit her, and that there "were so many things that happened [that she could not] remember them all." She also stated that he "sent" her to the hospital several times.

Jenee stated that when Lindsey was five, she attempted to leave the house after an argument. She testified that when she was backing her vehicle out of the driveway, Jessie jumped on top of the car and began pounding it with his fist. Then, she stated, Jessie punched out the side glass in the back seat where Lindsey was sitting. Jenee stated that the glass went into the vehicle, but Lindsey was not hurt. Once, she said, Jessie got mad because she went to a bar without him, pulled her out of the bar, and "busted" the windshield. Jenee described another incident in which Jessie took her to the hospital and let her out of the vehicle, nude. She stated the abuse that night occurred in front of her daughter. According to Jenee, she went to an abuse shelter with her daughter after leaving the hospital and then lived with friends.

Jenee also testified that Jessie "tore up" vehicles, televisions, a treadmill, dishes, cabinets, and the ceiling fan, and "busted" holes in the walls. She said that Jessie's actions were usually fueled by alcohol, and that he drank "all the time." Jenee believed that Jessie's abuse had a negative impact on her daughter because Lindsey was not emotionally stable and had "issues" as a result of Jessie.

Jenee was allowed to testify that Jessie did not provide a loving household in which to live or exhibit character traits that would be a good role model for Lindsey or the children. She also testified that Jessie did not provide a safe, secure, and stable home environment. Because of the trial court's evidentiary ruling, she was not allowed to provide the details of the abuse to the jury.

Jeanie Fruge Miller testified that she lived in Louisiana and was an insurance producer. She married Jessie on March 23, 2002, and they were divorced in July 2010. She stated that she was the mother of three children, and that Jessie adopted her two daughters. She described her marriage to Jessie as being "married to Satan." She testified that he hurt her "frequently," and that the first day she was married to him, he pushed her down the steps. Jeanie stated that Jessie once left her "for dead." According to Jeanie, she had major surgery during their marriage and was not allowed to climb into the bed because the bed was too high. During that time, she said, Jessie pushed her down and, as a result, she had to go to the emergency room. Jeanie testified that Jessie got scared and told her she had "better not tell them what happened." Jeanie described another incident in which Jessie stuck a small, short pistol in her mouth and attempted to make her pull the trigger. She testified that Jessie told her if she pulled the trigger, "it was suicide and not murder." Jeanie refused to pull the trigger and stated that Jessie kept kicking her with his steel toe work boots to try and make her do so, causing her legs to bleed. She testified that her daughters were in the house at the time and that one daughter saw Jessie put the gun in her mouth.

Jeanie described one incident that occurred when she was taking a bath. She stated that Jessie came in the bathroom and told her that she had rolled her eyes at him. Then, she said, Jessie pulled her out of the bathtub by her hair, and dragged her through the large master bathroom, through the master bedroom, through the foyer, and out of the house. She testified that he locked her outside the house, naked. She stated that she banged on the front door while Jessie laughed at her through the window. Jeanie testified that when she attempted to get in their car, Jessie locked both vehicles and laughed. Eventually, she said, Jessie let her back in the house.

Jeanie described another incident in which she had taken some medicine that made her sleepy. She stated that Jessie woke her up, told her she was worthless, and forced her to sit up. She testified that, at that point, Jessie went to the bathroom. According to Jeanie, she got out of bed to go upstairs and hide, but Jessie came up, took her by the hair, and tried to make her walk up the stairs. Jeanie stated that she expected abuse if Jessie was drinking. She described another incident in which Jessie took her hands, put them against the door jamb, and open and shut the door on her hands. That night, she said, her daughters came downstairs, pushed the door open, and the three of them left the house and went to her sister's house. Jeanie testified that Jessie

called her all night, and after she took the girls to school, she went home. She stated that Jessie was in the shower and when he finished, she asked him if he could stop drinking. Jeanie testified that Jessie "acted all concerned" and asked if he was worse when he was drinking. When she answered "[y]eah," he said, "Well, I'm not drinking now, bitch," took her head, and beat it against the bathroom mirror. She stated that her head was so sore she could not brush her hair "for days."

Jeanie testified that Jessie pulled her by the hair so much that she has a spot where the hair never grew back. She also stated that he left bruises on her, broke mirrors on her vehicle, and destroyed everything in the house. Jeanie described the incident in which Jessie broke the mirrors on her vehicle. She said that when she went to pick up her child support check while their divorce action was pending, Jessie wanted her to get out of her vehicle "because he always had some sick mind game going on." She refused but told him that she would do so after he gave her the check. She said that after Jessie handed her the check, she put her vehicle in reverse, and he became very angry, holding onto the vehicle and breaking the vehicle's mirror. Then, Jeanie stated, she attempted to cash the check at the bank, but Jessie had already called the bank and told them that his "soon-to-be ex-wife" had stolen the check from him.

Jeanie testified that the next time she went to pick up the child support check in the middle of January 2009, Jessie refused to hand her the check. She told him that she did not need it and Jessie responded by taking her keys and throwing them into a field. When she told him she would call her father, Jessie broke her cellular telephone in half. At that point, Jeanie testified, she got out of the vehicle and went into the house with him. She stated that she had never seen him so enraged, that he was losing control, and that she believed he could kill her. She said that her choice "was to have sex with [Jessie] or die." So she relented and then she pressed charges against him. Jeanie testified that in October 2009, Jessie turned off the electricity in an attempt to get her out of the house. She said that he would frequently turn up at the house, waiting, "going crazy because he didn't know where [she] was."

Jeanie was allowed to testify regarding the incident in which Jessie forced her to have sex with him when she arrived to pick up her child support check. She also stated that Jessie was cruel and had to have control over her. She testified that Jessie was not a good role model for her children nor did he provide a safe and secure environment for her and her daughters. Jeanie also stated that it was not in any child's best interest to live in the same household with Jessie.

8

Because of the trial court's evidentiary ruling, she was not allowed to provide further details to the jury.

**Analysis**

Here, we must determine if the trial court abused its discretion when it applied Section 153.004 of the Texas Family Code and limited evidence regarding domestic violence allegedly committed by Jessie that occurred before January 6, 2009. Holly contends that the trial court's ruling was made using Section 153.004 as a "guiding rule or princip[le] as to how long in the past evidence of alleged family violence is relevant in a child custody suit," and thus, not arbitrary. We disagree.

First, the plain language of Section 153.004 indicates that evidence of the intentional use of abusive physical force must be used in determining whether to appoint a party as a sole or joint managing conservator. *See* TEX. FAM. CODE ANN. § 153.004(a). However, this statute applies to an original suit for conservatorship, possession, and access, not a modification suit. *See id.*; ***In re D.B.W.***, No. 10-06-00057-CV, 2007 WL 603409, at \*3 (Tex. App.—Waco Feb. 21, 2007, no pet.) (mem. op.). In the present case, the final decree of divorce names the parties as joint managing conservators. Here, Patrick and Holly sought to modify only that order and, thus, Section 153.004 does not apply. *See **In re D.B.W.***, 2007 WL 603409, at \*3. Second, the plain language of Section 153.004 specifically states that its provision regarding evidence of the intentional use of abusive physical force applies to "parties." Jessie Miller, as Holly's new husband and stepfather to her children, was not a party to the original divorce and is not a party to this suit. Because Section 153.004 does not apply to this modification suit or to a nonparty, we conclude that the trial court abused its discretion by excluding evidence of Jessie Miller's domestic violence that occurred more than two years prior to the filing of the suit.

However, the trial court's error in excluding evidence of Jessie Miller's domestic violence is not grounds for reversal unless the error was reasonably calculated to cause, and probably did cause, rendition of an improper judgment. *See **Central Expressway Sign Assoc.***, 302 S.W.3d at 870; ***Gee***, 765 S.W.2d at 396. In other words, Patrick must show that the judgment turned on the excluded evidence. *See **Interstate Northborough P'ship***, 66 S.W.3d at 200. Patrick alleges that the rendition of the judgment turned on the jury's determination of the children's best interest, which depended upon the jury's receiving full and complete evidence of Jessie's domestic violence. He contends that the jury could not properly evaluate the stability of

Holly and Jessie's home or the emotional and physical danger to the children without evidence of Jessie's past domestic violence. We agree.

The best interest of the child is always the primary consideration in determining issues of conservatorship, possession of and access to the child, and child support. TEX. FAM. CODE ANN. § 153.002 (West 2008); *In re J.A.H.*, 311 S.W.3d 536, 541 (Tex. App.—El Paso 2009, no pet.). In determining the best interest of the child, we consider the public policies outlined in the family code. *Lenz v. Lenz*, 79 S.W.3d 10, 14 (Tex. 2002). Section 153.001 states that the public policy of Texas is to (1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child, (2) provide a safe, stable, and nonviolent environment for the child, and (3) encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage. TEX. FAM. CODE ANN. § 153.001(a)(1)-(3) (West 2008).

A wide array of factors can be relevant to the determination of a child's best interest, including (1) the child's desires, (2) the child's current and future physical and emotional needs, (3) any physical or emotional danger to the child in the present or future, (4) the parental abilities of the individuals involved, (5) the programs available to those individuals to promote the child's best interest, (6) the plans for the child by these individuals, (7) the stability of the home, (8) acts or omissions by a parent tending to show that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

In this case, the jury's determination turned on the excluded testimony of Jenee and Jeanie. Without their testimony, Holly was able to show that her home with Jessie was a safe, stable, and nonviolent household for the children. Jessie described his relationship with Holly as good and loving, and denied having a criminal record for family violence or that he had ever been arrested for family violence. Holly testified that Jessie was a great stepfather, her best friend, and that he was very loving, supportive, and caring. Holly denied that Jessie was violent, abusive, or that he called her names or drank or cursed excessively. Jessie and Holly described Lori Richard (a former paramour of Jessie's), Jenee, and Jeanie as attempting to destroy their marriage, and as being "bitter women" who are jealous of their relationship.

Other witnesses were allowed to testify, without reference to Jenee's and Jeanie's excluded testimony, that Jessie and Holly's home was safe and nonviolent. Holly's father,

Richard Dyson, testified that Jessie treated Holly "very well," that he was concerned about her, and that he (Dyson) did not fear that Jessie would harm her or the children. Lindsey Elizabeth Miller, Jessie and Jenee's daughter, testified that there were no disputes, conflicts, or family violence in the home.

This testimony, however, was in stark contrast to the excluded testimony of Jenee and Jeanie regarding Jessie's past violent behavior towards them. Without this testimony, the jury did not have all of the information necessary to fully evaluate the best interests of the children, including their physical and emotional needs and danger, the stability of the home, and the parental abilities of the individuals involved in the case. *See **Holley***, 544 S.W.2d at 371-72. Further, Jessie's alleged family violence took place within his marriages and in front of their children, thus providing evidence of a history of family violence. The crucial issue in this case was the best interest of the children. The evidence of Jessie's alleged domestic violence and behavior in his previous marriages would have provided substantial support for Patrick's request that he, not Holly, be named as the conservator with the exclusive right to designate the children's primary residence. Thus, the trial court's error in excluding Jenee's and Jeanie's testimony was reasonably calculated to cause, and probably did cause, rendition of an improper judgment. *See **Central Expressway Sign Assoc.***, 302 S.W.3d at 870; ***Gee***, 765 S.W.2d at 396.

Holly argues that the excluded testimony is cumulative of the testimony at trial, specifically referring to the testimony of Lori Richard. Again, we disagree. At trial, Lori Richard testified that she was in a sexual relationship with Jessie from 2008 until 2010. She admitted that she and Jessie had a relationship during Jessie and Holly's marriage. She described one incident that occurred at Jessie's home while Holly and the children were present. She testified that when she arrived, she got out of her vehicle and Jessie came out of the house, "hollering, get out of here, get out of here." Then, Lori said, Jessie grabbed her arms. She stated that she ran to the kitchen window, beating it, and yelling to Holly that she needed help. According to Lori, Holly came out of the house, stood in the garage, and "watched [Jessie] manhandle" her. She stated that Jessie shoved her in her vehicle, hit her with the vehicle's door, hit her on her leg, and shoved her between the vehicle's door while pushing her. Jessie and Holly denied Lori's version of the events and described some allegedly violent behavior by Lori that day. Even though this testimony appears to show that Jessie may have been violent when approached at his home by his paramour, it does not tend to show that he has a history of family

violence within his home and, thus, is not cumulative of the excluded testimony from Jenee and Jeanie.

Because the trial court's error in excluding Jenee's and Jeanie's testimony before January 6, 2009 was reasonably calculated to cause, and probably did cause, the rendition of an improper verdict, we conclude that the trial court's error was harmful. Accordingly, we sustain Patrick's first issue.

## DISPOSITION

Having sustained Patrick's first issue, we *reverse* the trial court's March 13, 2013 modification order, and *remand* the case to the trial court for further proceedings.


JAMES T. WORTHEN
Chief Justice


Opinion delivered August 29, 2013.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**AUGUST 29, 2013**

**NO. 12-13-00097-CV**

**PATRICK KITTMAN,**
Appellant
V.
**HOLLY KAY MILLER,**
Appellee

Appeal from the 273rd District Court

of Sabine County, Texas (Tr.Ct.No. 3818)

THIS CAUSE came to be heard on the appellate record and the briefs filed herein, and the same being considered, because it is the opinion of this court that there was error in the judgment of the court below, it is ORDERED, ADJUDGED and DECREED by this court that the judgment be **reversed** and the cause **remanded** to the trial court **for further proceedings** and that all costs of this appeal are hereby adjudged against the Appellee, **HOLLY KITTMAN MILLER**, in accordance with the opinion of this court; and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice..
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*