**Opinion filed April 27, 2023**



## In The

# Eleventh Court of Appeals

_____

## No. 11-22-00301-CV

_____

## IN THE INTEREST OF L.C.C. JR., A CHILD

---

### On Appeal from the 35th District Court
### Brown County, Texas
### Trial Court Cause No. CV2102037

---

### O P I N I O N

This is an appeal from an order in which the trial court terminated the parental rights of the mother and the father of L.C.C. Jr. Both parents filed an appeal. On appeal, each parent presents two issues. In their first issue, the parents assert that the trial court abused its discretion when it denied their request for an extension. In their second issue, each parent challenges the trial court's finding that the termination of his or her parental rights is in the best interest of L.C.C. Jr. We affirm the order of the trial court.

*Termination Findings and Standards*

The termination of parental rights must be supported by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001(b) (West 2022). To terminate parental rights, it must be shown by clear and convincing evidence that the parent has committed one of the acts listed in Section 161.001(b)(1)(A)–(U) and that termination is in the best interest of the child. *Id.* In this case, the trial court found that each parent had committed two of the acts listed in Section 161.001(b)(1)—those found in subsections (D) and (E). Neither parent challenges these findings on appeal.

The trial court also found, pursuant to Section 161.001(b)(2), that termination of the mother's and the father's parental rights would be in the best interest of the child. *See id.* § 161.001(b)(2). Each parent challenges the sufficiency of the evidence to support the trial court's respective best interest finding.

To determine if the evidence is legally sufficient in a parental termination case, we review all of the evidence in the light most favorable to the finding and determine whether a rational trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). To determine if the evidence is factually sufficient, we give due deference to the finding and determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We note that the trial court is the sole arbiter of the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (citing *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)).

With respect to the best interest of a child, no unique set of factors need be proved. *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). But courts may use the non-exhaustive *Holley* factors to shape their analysis.

2

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to, (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent–child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Id.* Additionally, evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *C.J.O.*, 325 S.W.3d at 266.

*Evidence Presented at Trial*

The record shows that the Department of Family and Protective Services became involved with L.C.C. Jr. shortly after his birth. The reasons for the Department's initial involvement included the mother's positive test for barbiturates, which may have been attributable to a prescribed medication or medication administered at the hospital, and the obstetrician's concern about the mother's abilities as a parent. The obstetrician gave the following example of the mother's concerning conduct before the birth of L.C.C. Jr.: When instructed that she needed to stay at the hospital because of her baby's heart rate, the mother refused to stay and said she would return "after the baby is delivered in the toilet." The "[d]eplorable" condition of the parents' home was also a concern for the Department.

L.C.C. Jr. was removed from his parents' care before he left the hospital. The trial court subsequently ordered the parents to comply with the requirements set forth in their family service plan. The family service plan required that the parents

complete a variety of services. The parents worked hard and completed their services. Among other things, they obtained suitable housing, tested negative on all drug screens, attended visitation, completed anger management and parenting classes, and went to counseling. As a result of the parents' progress, the trial court ordered that L.C.C. Jr. be returned to his parents' care in a monitored return.

The monitored return did not last long—only about six weeks. The Department removed L.C.C. Jr. from the monitored return after (1) a physical altercation between the mother and another child that was in the home and (2) the physical abuse of L.C.C. Jr. by the father. Both parents acknowledged that the mother and the father's teenaged daughter engaged in a physical altercation while L.C.C. Jr. was present, but the parents denied that the father had physically abused L.C.C. Jr. However, an MHMR worker, who was at the parents' residence for a visit with the older child, testified that she heard the father tell L.C.C. Jr., who was standing in a play pen with his face and hands pressed against the mesh: "Get your face off the mesh." The father repeated this command a little louder, and when L.C.C. Jr. did not comply, the father "walked over to the baby and grabbed him on the outside of his arms and shoved him over to the other side of the play pen and pressed him pretty firmly into the . . . mattress."

Additionally, a 2INgage worker who, for over a year, observed visits between the parents and L.C.C. Jr. testified regarding the parents' inappropriate conduct. She testified that the mother would have to be told to interact with L.C.C. Jr. and that the parents would get angry and argue with each other when L.C.C. Jr. cried. During one such incident, the father kicked L.C.C. Jr.'s infant carrier "pretty hard" while L.C.C. Jr. was in it—causing the carrier to move approximately two feet across the floor and causing L.C.C. Jr. to scream. This same worker had seen the father "yank" L.C.C. Jr. up by his arm when the father was angry.

4

When L.C.C. Jr. was removed from the monitored return, he had bruises between his eyes, on his temple, and on one side of his back. L.C.C. Jr.'s pediatrician was particularly concerned about the unusual bruise on the side of the back; that bruise appeared to be consistent with someone hitting or throwing the child. The pediatrician ordered "skeletal surveys"—which showed no fractures. The pediatrician testified that he would be concerned for the safety of any child placed in the parents' care and that he did not believe it would be in L.C.C. Jr.'s best interest to be returned to the care of his mother and father.

Other testimony showed that L.C.C. Jr. regressed during the monitored return. Upon being returned to the foster parents after the monitored return ended, L.C.C. Jr. had quit talking, had become frightened of loud noises, had developed night terrors, and had become very clingy. The foster mother described the night-terror episodes as L.C.C. Jr. waking up screaming in the middle of the night and taking about thirty or forty-five minutes to calm down—sometimes twice a night. He also cried a lot more after the monitored return ended, especially when being picked up at daycare for transport to, and upon the parents' arrival at, the supervised visits. And sudden movements caused him to flinch; he would put his hands up in a defensive manner as if he thought someone was going to hit him. According to the foster mother, it takes about two nights after each post-monitored-return visit with the parents for the night terrors to cease.

After the monitored return ended, the parents were again required to participate in various services, including counseling and anger management. The parents' counselor indicated that, although the parents were ultimately discharged from counseling, the counseling was not successful. According to the counselor, the parents failed to accept any responsibility for their actions and continued to put the child at risk—necessitating additional referrals. The parents' counselor testified that

5

a young toddler, such as L.C.C. Jr., would not be safe in the care of the mother and the father.

Both parents testified at trial. They disputed some of the testimony of other witnesses. The father specifically testified that L.C.C. Jr. was not in the infant carrier when the father kicked it and that the father was just moving it with his foot so that he would have more leg room. Both parents denied that the play pen incident ever occurred; the parents indicated that the father was outside the entire time that the MHMR worker was inside their residence. The father also testified that he no longer has a temper.

The permanency goal for L.C.C. Jr. was "Unrelated Adoption." At the time of trial, L.C.C. Jr. remained in the care of the foster parents with whom he had been placed since he was released from the hospital after his birth (with the exception of the time spent in the monitored return). The foster parents, who had other adopted children in their home, provided L.C.C. Jr. with a safe and stable home.

Several witnesses testified either that it *would not be* in L.C.C. Jr.'s best interest *to return* to the care of his mother and father or that it *would be* in L.C.C. Jr.'s best interest for the parental rights of both parents *to be terminated*. These witnesses included the child's pediatrician, the mother's obstetrician, the mother's case manager for her MHMR services, and a 2INgage case manager that had been assigned to this case. The attorney and guardian ad litem for L.C.C. Jr., who had previously advocated for the monitored return, informed the trial court that, in her opinion, the parental rights of the mother and the father should be terminated.

*Analysis*

*Best Interest of the Child*

In each parent's second issue, they assert that the evidence presented at trial was insufficient to prove by clear and convincing evidence that the termination of

that parent's parental rights would be in the best interest of L.C.C. Jr.  The trial court, as the trier of fact, is the sole judge of the witnesses' credibility.  *A.B.*, 437 S.W.3d at 503.  We are not at liberty to disturb the determinations of the trier of fact as long as those determinations are not unreasonable.  *J.P.B.*, 180 S.W.3d at 573.  Giving due deference to the trial court, we hold that, based on the evidence presented at trial and the *Holley* factors, the trial court could reasonably have formed a firm belief or conviction that termination of the mother's and the father's parental rights would be in the best interest of L.C.C. Jr.  *See Holley*, 544 S.W.2d at 371–72.

As set forth above, the Department presented testimony from multiple witnesses regarding the bruised condition of L.C.C. Jr. at the time that the monitored return ended, L.C.C. Jr.'s fear of the mother and the father during visits that occurred after the monitored return, the physically and verbally aggressive behavior of the father toward L.C.C. Jr., and the mother's inappropriate behavior toward another child in the parents' home.  There was no question that domestic violence occurred in the home.  L.C.C. Jr.'s attorney and guardian ad litem, who had previously advocated for the monitored return, believed that the parents abused and "broke" L.C.C. Jr. during the monitored return and that their parental rights should be terminated.  Upon considering the record as it relates to the actions of the mother and the father, the emotional and physical danger to the child now and in the future, the apparent desires of the child, the emotional and physical needs of the child now and in the future, the parental abilities of those involved, the domestic violence in the parents' home, and the plans for the child by the Department, we hold that the evidence is legally and factually sufficient to support (1) the finding that termination of the mother's parental rights is in the best interest of the child and (2) the finding that termination of the father's parental rights is in the best interest of the child.  *See id.*  We defer to the trial court's findings as to the child's best interest, *see C.H.*, 89

S.W.3d at 27, and we cannot hold in this case that the trial court's findings as to best interest are not supported by clear and convincing evidence. Accordingly, we overrule each parent's second issue.

*Denial of Motion for Extension*

In each parent's first issue, they contend that the trial court abused its discretion when, after determining that it had no authority to grant an extension after the monitored return ended, it denied the parents' requests for an extension under Section 263.401 of the Family Code. *See* FAM. § 263.401 (West Supp. 2022). Generally, we review a trial court's decision to grant or deny an extension requested under Section 263.401(b) for an abuse of discretion. *In re M.G.*, 585 S.W.3d 51, 58 (Tex. App.—Eastland 2019, no pet.); *In re D.W.*, 249 S.W.3d 625, 647 (Tex. App.—Fort Worth 2008, pet. denied). However, the issue presented in this case also requires that we construe the applicable statutes. Statutory construction involves a legal question, which we must review de novo. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008). In doing so, we must attempt to ascertain and give effect to the legislature's intent as expressed by the language of the statute. *Id.*; *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006).

Here, the applicable statutes are (1) Section 263.401, which provides for an automatic dismissal date and one permissible extension of that date, and (2) Section 263.403, which provides for a monitored return of a child to his parent. The record shows that after the monitored return ended, the trial court set a new dismissal date of November 1, 2022, in accordance with Section 263.403(c). On October 3, 2022, one week prior to the commencement of the final hearing on termination, the mother filed a motion for a second monitored return and/or an extension of the dismissal date. The father joined this motion. The parents asserted that a Section 263.401 extension remained "legally available" after the monitored

return ended because the trial court had not previously extended the dismissal date in this case under Section 263.401. The trial court did not agree, and it denied the parents' request for an extension, stating that "there is no ability to extend any further" and recognizing that it was the legislature's intent "not to exceed a case more than two years, which would happen if [the trial court] continued to be able to pile extensions on."

Section 263.401 provides for the automatic dismissal and the trial court's loss of jurisdiction over a parental termination suit filed by the Department—if trial on the merits is not timely commenced. *Id.* § 263.401(a), (c). That same section, however, also authorizes a trial court to retain a parental termination case on its docket by granting one extension "for a period not to exceed 180 days after" the original dismissal date provided for in Section 263.401(a). *Id.* § 263.401(b). The original dismissal date is "the first Monday after the first anniversary of the date the court rendered a temporary order *appointing* the department as temporary managing conservator." *Id.* § 263.401(a) (emphasis added).

Section 263.403 also permits a trial court to retain a parental termination case on its docket beyond the original dismissal date. Section 263.403(a) provides: "Notwithstanding Section 263.401, the court may retain jurisdiction and not dismiss the suit or render a final order as required by that section if the court renders a temporary order" for a monitored return of the child to a parent. *Id.* § 263.403(a). Under a monitored return, the Department is "to *continue to serve* as temporary managing conservator of the child." *Id.* § 263.403(a)(3) (emphasis added). When a trial court grants a monitored return under Section 263.403, it must schedule a new dismissal date. *Id.* § 263.403(b)(2). If, before that dismissal date, the monitored return fails and the child must be removed from the parent's home by the Department, the trial court shall again set a new dismissal date. *Id.* § 263.403(c).

9

"The new dismissal date may not be later than the original dismissal date established under Section 263.401 or the 180th day after the date the child is moved [from the monitored return] . . . , whichever date is later." *Id.*

Section 263.401 does not authorize a trial court to extend the dismissal date to a date beyond the 180th day after the original dismissal date. In this case, the original dismissal date was February 7, 2022. The trial court did not thereafter render another temporary order "appointing" the Department as temporary managing conservator. *See id.* § 263.401(a). Thus, the trial court was not authorized under Section 263.401 to extend the dismissal date to a date later than August 6, 2022—180 days after February 7. *See id.* § 263.401. The parents requested an extension and a dismissal date that was well beyond the extension authorized by Section 263.401. Furthermore, nothing in the monitored-return statute authorizes a trial court to set a new dismissal date that is later than the 180th day after a child is removed from a monitored return. *See id.* § 263.403(c). In this case, the trial court calculated the post-monitored-return dismissal date as November 1, 2022.

Additionally, as recognized by various courts in Texas, the legislative intent behind Section 263.401 is to provide permanence and stability to children who have been removed from their parents and to prevent those children from languishing indefinitely in foster care. *See In re B.W.*, 99 S.W.3d 757, 758–59 (Tex. App.—Houston [1st Dist.] 2003, no pet.); *In re T.M.*, 33 S.W.3d 341, 346 (Tex. App.—Amarillo 2000, no pet.); *In re Neal*, 4 S.W.3d 443, 447 (Tex. App.—Houston [1st Dist.] 1999, orig. proceeding); *In re Bishop*, 8 S.W.3d 412, 416–17 (Tex. App.—Waco 1999, orig. proceeding).

Based on the language of the relevant statutes and also on the legislature's intent in enacting those statutes, we conclude that the trial court did not err when it determined that a further extension of the dismissal date was not available under

Section 263.401.  Thus, the trial court did not abuse its discretion when it denied the parents' request for an extension.  We overrule each parent's first issue on appeal.

*This Court's Ruling*

We affirm the order of the trial court.


JOHN M. BAILEY

CHIEF JUSTICE


April 27, 2023

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.